STATE OF NORTH CAROLINA v. CHARLES DONALD YOES
AND
WILLIE HALE, JR. (ALIAS WILLIE HAILE, JR.) AND LEROY DAVIS, PETITIONERS, v. STATE OF NORTH CAROLINA.

(Filed 1 November, 1967.)

**1. Criminal Law § 146—**

Upon appeal from a sentence of life imprisonment, the Supreme Court must be careful to ascertain that the established procedures have been observed, and if there has been a substantial and prejudicial departure therefrom the Supreme Court must set aside such conviction and resulting judgment, irrespective of the court's opinion of the innocence or guilt of the accused.

**2. Constitutional Law § 28;   Indictment and Warrant § 2—**

A valid indictment is a condition precedent to the jurisdiction of the Superior Court in a criminal prosecution for a capital felony and the return of such indictment by a legally constituted grand jury is necessary to such indictment.

**3. Constitutional Law § 36;   Rape § 7—**

The statute fixing death as the punishment for rape, G.S. 14-21, unless the jury in its discretion recommends life imprisonment, is authorized by the Constitution of North Carolina, Art. XI, § 2, and since such punishment is specifically authorized both by the State Constitution and by statute it cannot be cruel or unusual punishment in the constitutional sense.

**4. Same;   Constitutitonal Law § 30—**

The contention that the statutory punishment for rape, G.S. 14-21, is unconstitutional because it is enforced in a discriminatory manner against Negro defendants is untenable, since the punishment applies to all persons convicted of the offense without discrimination on account of the race of the convicted defendant or the race of the victim, and discriminatory enforcement is not shown by a tabulation of results reached in different cases.

**5. Same;   Constitutional Law § 31—**

It is not error for the court to quash Negro defendants' subpoenas *duces tecum* to clerks of court of other counties and to refuse to hear purported evidence of racial discrimination in prosecutions for rape, since such discrimination cannot be established by a tabulation, even if accurate and complete, of results reached in different cases tried before different juries upon evidence which necessarily varies from case to case.

**6. Indictment and Warrant § 2—**

By constitutional provision in this State, Art. I, § 17, which antedates like holding by the Supreme Court of the United States under the Fourteenth Amendment to the Federal Constitution, the indictment of a Negro defendant by a grand jury from which members of defendant's race have been intentionally excluded on account of race is not a valid indictment and confers upon the court no jurisdiction of the prosecution.

**7. Grand Jury § 1—**

A grand jury is not unlawful merely because it is drawn from the tax list of the county.

**8. Same—**

It is not required that the Negro race be represented on the grand jury panel in the same ratio as the total Negro population of the county bears to the total population.

**9. Same—**

It is not the right of any party to be indicted by a jury of his own race or to have a representative of any particular race on the jury, but it is his right to be tried by a competent jury from which members of his race have not been unlawfully excluded.

**10. Same—**

While a Negro moving to quash an indictment on the ground of racial discrimination must prove affirmatively the intentional exclusion of members of his race from the grand jury, he may do this by circumstantial evidence, and a showing that in the county over a substantial period a small proportion of Negroes had served on the jury or a showing that the jury scrolls had a symbol indicating the race of those appearing thereon, while not conclusive, does raise a *prima facie* case of discrimination, casting the burden upon the State to go forward with evidence sufficient to overcome such *prima facie* case.

**11. Same— Evidence held to support finding that there was no racial discrimination in selection of grand jury.**

Any intimation of racial discrimination arising from the fact that the scrolls in the jury box carry a symbol designating race is not conclusive of racial discrimination in the selection of grand jurors therefrom, and such intimation is rebutted when the record contains uncontradicted evidence that the name of every person listing property or poll for taxation in the county went into the jury box, except those purged for lack of moral character or mental incapacity, and there is no evidence that any name placed in the box was withdrawn therefrom after it was placed therein, and there is uncontradicted testimony that no name drawn from the jury box for the panel was laid aside for any reason whatsoever, and there is further uncontradicted evidence that no member of the board of commissioners was aware of the significance of the code designation of race and that the grand jury was drawn from the jury box in their presence by a child under the age of ten years.

**12. Same; Jury § 3—**

The provisions of G.S. 9-1 and G.S. 9-2 are directory, and while the statutes contemplate that the county commissioners shall examine the lists and eliminate therefrom those lacking good moral character or sufficient intelligence, the fact that this is done by the sheriff and his deputies or any other person does not vitiate the indictment when there is nothing in the record to raise even the suspicion that the name of any person possessing good moral character and sufficient intelligence was stricken from the list, or that there was any discrimination in the purging of the lists, or any deviation from the material procedures prescribed by the statutes.

**13. Same—**

The county commissioners themselves cannot reject a name drawn from the box for service upon a grand jury panel upon the ground of bad char-

acter or lack of mental capacity, this power being vested in them only while the jury list is being prepared for the insertion of names into the box.

**14. Jury § 4—**

Challenge to the array of the jury on the ground of racial discrimination is properly denied when the record affirmatively discloses no such discrimination in the selection of the names for the jury box or in the selection of a special venire from the residents of the county, and it further appears that those called were actually interrogated in open court, and that the presiding judge had this visual evidence before him in passing upon each challenge on the ground of racial discrimination, found no racial discrimination and the record and defendants' brief are silent upon this demonstration concerning the composition of the jury.

**15. Jury § 3—**

Objection to the fact that members of the regular panel were present in the courtroom during the taking of evidence in support of motion to quash the bills of indictment on the ground of racial discrimination is without merit when the record discloses that nothing was said in those proceedings relating to the merits of the case.

**16. Jury § 2—**

There is no error in ordering a special venire to be summoned from the body of the county after the exhaustion of three such venires drawn from the jury box.

**17. Same— Record held to show absence of discrimination in summoning special venire from body of county's residents.**

Where the evidence discloses that the sheriff and his deputies, in summoning from the body of the county a special venire, selected at random a name out of every five or ten pages of the tax books and then summoned such person by telephone without regard to race, the fact that they knew the significance of code numbers in the tax books designating race and knew the streets of the city upon which white and Negro citizens were likely to reside, while disclosing the possibility of racial discrimination in the selection of the persons summoned, is insufficient to support a motion for quashal for racial discrimination, when the record affirmatively shows the absence of such discrimination, the proportion of Negroes so summoned being substantially in excess of the proportion of the Negro population to the total population of the county, nor is this result affected by the fact that the deputy sheriff supervising the selection of the veniremen had participated in the investigation of the alleged offense and was a witness for the State.

**18. Same—**

Motion of defendant that a venire be summoned from another county is addressed to the sound discretion of the presiding judge and will not be disturbed in the absence of a showing of abuse. G.S. 1-86.

**19. Criminal Law § 92—**

A motion by the State to consolidate indictments against four defendants for successively raping the same female during a single episode, and the motion of defendants for separate trials are addressed to the discre-

STATE v. YOES AND HALE v. STATE.

tion of the trial court, G.S. 15-152, and his ruling allowing the motion
for consolidation will not be disturbed in the absence of a showing of
abuse.

**20. Criminal Law § 98—**

Defendants' motion for sequestration of witnesses is addressed to the
sound discretion of the trial court, and the denial of the motion will not
be disturbed in the absence of a showing of abuse.

**21. Constitutional Law § 30—**

The exclusion of bystanders during the testimony of the prosecutrix in
a prosecution for rape, representatives of the press and parents of the
defendants not being excluded during her testimony, is not a denial of
defendants' right to a public trial, the matter being within the discretion
of the trial court and no abuse of discretion being shown.

**22. Criminal Law § 126—**

Upon the polling of the jury in regard to its verdict of guilty of rape
returned against one defendant, one juror stated that his verdict as to
such defendant was guilty but that he recommended mercy, whereupon
the court sent the jury back for further deliberations after instructing
them that the verdict must be unanimous. *Held:* The contention that the
instruction required that the same verdict be returned as to all de-
fendants is untenable, the court having expressly charged the jury to the
contrary, saying as to each defendant by name that the jury might
return one of three verdicts, guilty as charged in the bill of indict-
ment, guilty as charged in the bill of indictment with recommendation for
life imprisonment, or not guilty.

**23. Jury § 4—**

There is no error in permitting the solicitor to ask each prospective
juror if he had conscientious scruples against returning a verdict carry-
ing the death penalty if the evidence convinced him to a moral certainty
of defendant's guilt of the capital crime charged.

**24. Jury § 3;    Criminal Law § 161—**

It is reprehensible for appellant in an assignment of error to quote
widely separated portions of the record in such a manner as to give the
impression that there is no omission when in fact the statements so placed
in the assignment of error are wholly unrelated and occurred in connec-
tion with the examinations of different prospective jurors.

**25. Jury § 3—**

Remarks of the trial judge, considered in context, during the interro-
gation of prospective jurors *held* not to contain, by any reasonable inter-
pretation, an expression of opinion by the court concerning the guilt or
innocence of defendants.

**26. Criminal Law § 120—**

The charge of the court in the present case *held* not to contain any
statement tending to influence the jury in regard to whether it should
return a verdict of guilty without recommendation of life imprisonment,
and in any event the verdict of guilty with such recommendation dis-
closes that there could not have been any prejudice.

**27. Jury § 3—**

Defendant's question to a prospective juror *held* not framed so as to elicit information as to whether such juror might feel justified in returning a verdict of guilty with recommendation of life imprisonment and did not state any hypothesis upon which such recommendation might or might not be justified, and therefore the sustaining by the court of objection to the question was not error.

**28. Criminal Law § 111—**

The charge of the court in this case *held* to contain a full and fair summary of the evidence and the contentions of the parties, together with an accurate statement and explanation of the principles of law applicable thereto, with no expression or intimation of an opinion by the court as to whether any fact was or was not sufficiently proved, and defendants' assignments of error thereto are overruled.

**29. Rape § 5—**

The State's evidence tending to show that defendants accosted prosecutrix and her escort as they were parked in their automobile, ordered her escort out of the car and struck him unconscious when he attempted to fight, and that defendants disrobed prosecutrix and had successive intercourse with her one after the other despite her resistance, a rifle being pointed to her side throughout the occurrences, *held* amply sufficient to overrule each defendant's motion for nonsuit and not to require the submission to the jury of any less degree of the offense.

**30. Criminal Law § 99—**

There could have been no prejudice to defendants in the court's direction to their counsel that a recording device be removed from the courtroom when the record discloses that the recording device in question was not connected or in operation.

**31. Criminal Law § 89—**

It will not be held for error that the court refused to allow defendants' counsel to play, in the presence of the jury, an alleged recording of previous statements by a State's witness then under cross examination, which recording device had not been authenticated or offered in evidence, there being no circumscription of defendants' right to cross-examine any witness for the State as to whether such witness had theretofore made contradictory statements and the court having specifically stated that the defendants at the proper stage of the trial might recall as their witness any person whose voice was purportedly recorded to identify his voice and the statement so recorded.

On *certiorari* upon petitions of the defendants to review the judgment of *Gambill, J.*, at the 30 November 1964 Criminal Session of GUILFORD, Greensboro Division.

In separate indictments these defendants and their co-defendant, Julian Odell Hairston, were charged with successive rapes of the same woman in Guilford County on 21 June 1964. The cases were consolidated for trial over their objections. As to each defendant, the jury returned a verdict of guilty, with a recommendation for

life imprisonment. Sentences were imposed accordingly. Each defendant gave notice of appeal.

Subsequently, Yoes, represented by privately employed counsel, petitioned for permission to appeal as a pauper and for an order directing the county to furnish a transcript to him at its expense. This petition was denied by the presiding judge. This Court granted *certiorari,* permitting Yoes to appeal *in forma pauperis,* and directing a full transcript to be supplied to him at the expense of the county. Thereafter, this Court allowed other motions by Yoes for extensions of time for docketing the record in this Court for review. The record so docketed in this Court consists of 1562 pages, being replete with needless and multiple repetitions of utterly immaterial matter, to a degree unparalleled in cases in which the appellant bears the expense of preparing the record for review.

On 4 March 1965, the presiding judge allowed the motion of the solicitor to dismiss the appeals of the defendants Davis, Hale and Hairston for failure to perfect the same within the time allowed. A little more than one year thereafter, Davis and Hale filed separate petitions for post conviction relief, each alleging that his right of appeal had been denied. These petitions were heard before Shaw, J., who so found, and on 15 July 1966 ordered their court appointed counsel to prepare and file their respective cases for review by this Court, directing that a complete transcript of the trial proceedings be furnished them at the expense of the county. Petitions for *certiorari* were thereupon filed in this Court on behalf of Davis and Hale. *Certiorari* was granted in each instance 20 September 1966, and the cases were set for argument in this Court for the Fall Term 1966. Motions by the defendants for extension of time were subsequently granted.

Acting upon the advice of his court appointed counsel, Hairston did not perfect his appeal, has not sought post conviction relief and has not otherwise sought appellate review of the judgment entered against him.

The cases of Yoes, Davis and Hale were consolidated for argument in this Court and were argued 6 September 1967. The three appealing defendants have joined in presenting to this Court the same record for review, the same assignments of error and a common brief.

### MOTIONS TO QUASH THE BILLS OF INDICTMENT

Each defendant, in apt time, moved in the superior court to quash the bill of indictment against him on the grounds that (1) Negroes were systematically and arbitrarily excluded from service

on the grand jury, each of the defendants being a Negro; (2) the statutory requirements were not observed in the selection of the grand jurors; (3) the statute providing for the death penalty upon conviction of rape is unconstitutional upon its face; and (4) the said statute is unconstitutional as applied in this State. The motions to quash were overruled.

The evidence relating to the selection of the grand jury may be summarized as follows:

The grand jury which indicted the defendants was selected from a panel of 50 names. The panel was drawn from the jury box in the presence of the county commissioners by a child under ten years of age, on 1 June 1964, three weeks prior to the alleged offenses, six weeks prior to the returning of these indictments, and six months prior to the commencement of the trial.

The 50 names so drawn from the jury box were placed on a list which was then cut into scrolls, each scroll containing one name. In open court, under the supervision of the presiding judge, these 50 scrolls were placed by the clerk in a hat, stirred and then drawn from the hat, one at a time, by a child seven years of age. The first 18 names so drawn constituted the grand jury, two Negroes (11%, plus) being included and serving on the grand jury. The foreman was then designated by the presiding judge.

The jury box, from which the panel was so drawn, consisted of two compartments, designated No. 1 and No. 2 and separated by a partition. There was no opening in the box except a hinged top, which was locked shut by two substantial padlocks, opened by different keys.

Except when a jury is being drawn, the box is in the possession of the sheriff. The key to one lock is kept by the clerk to the board of county commissioners in the office of the county manager. The key to the other lock is kept in the custody of a deputy sheriff, who leaves it hanging on a keyboard in a portion of the sheriff's office to which other members of the sheriff's staff have access in the absence of this deputy. There are no other keys which fit either lock.

When a jury panel is to be drawn, the box is brought by the sheriff into the presence of the board of county commissioners, then sitting in a meeting open to the public. The names are drawn from Compartment No. 1 of the box in the presence of the commissioners by a child under ten years of age, the commissioners paying close attention. The names so drawn are placed in an envelope which is sealed in the presence of the commissioners and delivered to the deputy sheriff. The sheriff then summons those whose names are in the envelope. The scrolls bearing such names are then returned to the

STATE *v.* YOES AND HALE *v.* STATE.

jury box, being put into Compartment No. 2. When the drawing of a jury panel is thus completed, the box is relocked and it and the two keys are returned to their respective custodians.

After the names of a jury panel are so drawn, no name is added to or taken from the panel. A person so summoned may apply to the clerk of the court or to the presiding judge to be excused from service because of a statutory exemption or personal hardship.

This procedure was followed in the drawing and handling of the panel from which the grand jury in question was selected. The child who drew these names from the jury box drew the scrolls, one by one, from Compartment No. 1 and handed each scroll to the deputy sheriff in the presence of the county commissioners and other persons attending the meeting of the board.

The jury list of names to go into the box is compiled anew each two years. At the proper time, the names of approximately 70,000 persons, each written on a separate scroll, were placed in Compartment No. 1 of the jury box. Except as noted below, all names so placed in the jury box were taken from the tax lists of the county for the year 1963. The names of approximately 70,000 individuals appear on the tax lists. Except as noted below, all of those names were placed in Compartment No. 1 of the jury box.

There is no evidence as to how many of these 70,000 persons whose names appear on the tax lists for 1963 were white and how many were Negro, except that of the males listed for poll tax (all males between the ages of 21 and 50), 32,946 were white and 4,432 (11%, plus) were Negro.*

The county is divided into 18 townships for each of which a tax list is compiled. From the annual tax listings, an IBM card for each person listing property or poll for taxation is prepared by the county's data processing office. These cards are used for various purposes, including the preparation of tax bills, various statistical reports and studies, and the preparation of the list of names to go into the jury box. Each card carries the name and certain code numbers applicable to such taxpayer.

The purpose of these code numbers is to enable the Data Processing Department of the county to prepare quickly and accurately various statistical studies and reports. For example, the county is

*For the year 1962, there is an obvious misprint in the record. The North Carolina Department of Tax Research reports for that year that 32,829 white males and 4,321 Negro males (11%, plus) were listed for poll tax in Guilford County. The United States Census for 1960 shows 194,984 white and 51,159 Negro residents (20%, plus) of all ages and both sexes in Guilford County, there being only a negligible number of residents of other races.

required to report annually to the State Department of Tax Research the number of white males and Negro males, respectively, listed for poll tax purposes. To facilitate the preparation of this report, and possibly other statistical reports, the code number "1" on a card designates a white person and the code number "2" designates a Negro person. Other code numbers on these cards designate such things as the taxpayer's residence in a particular school or fire district, the last four digits of the taxpayer's social security number for identification purposes, the year of birth of males for poll tax purposes, whether the taxpayer is a nonresident or in military service, and the township in which property so listed is located.

At the time of the drawing of the jury panel from which this grand jury was selected, the county commissioners were not aware of the significance of the code numbers "1" and "2". The scrolls which went into the jury box carried, in addition to the name and address of the person, these code numbers and other code numbers, but the commissioners did not know their significance and were concerned only with the name and address of the person whose scroll was drawn by the child.

For the preparation of the jury list, the Data Processing Department, using the IBM machines, prepared a complete list of all names shown on the IBM cards for 1963. The original and a carbon copy of this list were delivered to the Tax Department, the carbon copy being ultimately filed with the clerk of the board of county commissioners. This list contained the name of every person listing property or poll for taxation in Guilford County in 1963. The Tax Department eliminated duplications, as where the same taxpayer listed property in two or more townships. It also deleted from this list the name of any wife listing property jointly with her husband and then prepared a separate slip for the wife, showing her name, address and appropriate code numbers.

Pursuant to instruction from the county commissioners, the Tax Department then turned to telephone directories and city directories and added to the list the names and addresses of a relatively few persons not appearing on the tax list, these names not carrying any code numbers, and the race of these persons being unknown to the Tax Department.

The sheriff and his deputies then examined the list and eliminated therefrom persons who had died or moved out of the county or who had been convicted of a felony, or other crime involving moral turpitude, and persons not mentally competent to serve as jurors. The county commissioners made no exclusions of names whatsoever from the list. They delegated to the sheriff the task of so purging it, giv-

ing him no standards whatever for his guidance. He and his deputies relied on their personal knowledge and judgment in striking off the names they deemed improper for inclusion for these reasons. The sheriff knows of no instance of any person's being excluded from the list because of his race, creed or color.

The list so compiled and revised was then cut into pieces or scrolls, each scroll bearing the name, address and the several code numbers of one person as shown on the IBM card in the Data Processing Department, no code numbers appearing on the scrolls of persons selected from city and telephone directories. All of these scrolls were then placed in Compartment No. 1 of the jury box. From this compartment of the box, the panel of 50 names, from which the grand jury was selected, was drawn as above described. Except for the exclusions by the sheriff and his deputies, above mentioned, the name of every person listing property or poll for taxation in Guilford County in 1963 was so placed in Compartment No. 1 of the box.

This process is repeated every two years, at the end of each such period the jury box being completely emptied of scrolls and refilled. The members of the board of county commissioners did not see, and habitually do not see, the list, so compiled by the Tax Department and so purged by the sheriff and his staff, prior to its being cut apart and the scrolls being placed in the jury box.

There is no evidence that the name of any person whose scroll was drawn from the jury box for the panel in question, or any other jury panel, was excluded from such panel by any person for any reason whatsoever. Some, of course, were not found and so were not summoned.

The sheriff, the clerk of the court, the former solicitor, the tax supervisor, the chairman and other members of the board of county commissioners, all of whom had served for many years, each testified that he did not know of any instance in which the name of any person had been excluded from the jury list, or from any panel drawn, because of race, color or creed.

Upon this evidence the trial court made findings of fact, including findings that Negroes were drawn and appeared on the grand jury that indicted these defendants; that the above mentioned code numbers indicating the race of the respective taxpayers remained on the scrolls placed in the jury box; when the panel from which the grand jury was selected was drawn from the box, the commissioners were not aware that the code numbers were on the scrolls and did not know their significance; no person's name was left out of the box, or added to the box, or laid aside upon the drawing of the panel because of race, creed or color; there has been no arbitrary or

systematic exclusion from jury service in Guilford County at any time because of race, creed or color, and none with reference to the panels from which the grand jury and the trial jury in this case were chosen. The court further found that the selection of the names going into the jury box and the drawing of names therefrom for jury service were in accord with Chapter 9 of the General Statutes of North Carolina. Upon these findings of fact, the court denied the motions to quash the bills of indictment.

### Challenges to the Array.

In due time, the defendants filed challenges to the array, thus attacking the validity of the trial jury and of each panel or venire from which its members were chosen. Of the 12 jurors returning the verdict, one was a member of the regular panel drawn for the term from the above described jury box in the above described manner. The regular panel having been exhausted, the trial judge ordered three successive special venires, a total of 400 prospective jurors, and directed that their names be drawn from the jury box, which was done over the objection of each defendant entered in apt time. From these drawings a total of nine jurors was selected. The trial judge thereupon, over the objection of each defendant, issued another venire *facias* directing the sheriff to summon 50 additional persons, "freeholders, qualified to act as jurors, from the body of" the county. From this group two of the 12 jurors were selected.

For the selection of the 50 persons, pursuant to the fourth venire *facias*, the sheriff used five pairs of deputies. All were under the immediate direction of Lt. Allred, a member of the sheriff's staff, who had participated in the investigation of the alleged offense with which the defendants were charged, and who was then under subpœna as a witness for the State. Lt. Allred instructed the deputies to take a city directory, select at random a name out of every five or 10 pages, and then summon such persons by telephone. He, himself, went to High Point, took the tax books of that area of the county, choose names from those books, and summoned by telephone the person so chosen by him. He did not discuss the case with any of these persons. He testified that no prospective juror was included or excluded because of race, though he could determine the race of each prospective juror so summoned by him by the address. He did not know any of them personally.

Deputy Frank Smith, who assisted Lt. Allred in the selection of these veniremen from the High Point area, and who was also under subpœna as a witness for the State, testified that they took 28 names

at random from the tax books in High Point and telephoned these people until they reached and served their quota of 10. He testified that they did not exclude or include any person for any reason whatever, but simply took the names as they came to them by the above process. He did not know any of the persons so selected and summoned by him, but did know the general areas of the city of High Point in which white people and Negro people, respectively, reside, and knew from the code numbers "1" and "2" appearing on the tax books which persons were white and which were Negro. He had helped to select juries previously in Guilford County and knew of no case in which any person had been excluded from or included upon a jury because of race, creed or color.

The 12 jurors having been selected from the regular panel, and the four special venires above mentioned, the court, over the objection of each defendant, issued a fifth venire *facias* directing the sheriff to summon 50 additional "freeholders, qualified to act as jurors, from the body of" the county. The same procedure was used in selecting this venire as was followed in the fourth, except that, the tax office in High Point being closed, the names from the High Point area were selected for the fifth venire from the city directory. From the fifth venire an alternate juror was selected but, before the jury retired to begin its deliberations, this alternate juror was discharged and took no part in the deliberations or verdict of the jury.

The defendants' challenge to the array was upon the ground that the regular jury panel and the first three special venires were drawn from the jury box which, the defendants allege, afforded the opportunity for selective exclusion and discrimination against members of the Negro race. As to the fourth special venire, which was not drawn from the box, the ground of challenge was that G.S. 9-29 and G.S. 9-30 are unconstitutional, and any special venire drawn pursuant to the provisions of G.S. 9-29 affords the opportunity for selective exclusion and discrimination against members of the Negro race and other citizens qualified to serve as jurors. They further challenge the fourth special venire on the ground that the officers who selected the veniremen were witnesses for the State and had participated in the investigation of the alleged offenses, and, under all the circumstances, an opportunity was afforded for the selective exclusion and inclusion of persons upon such special venire in violation of the State and Federal Constitutions.

Both as to the regular panel and as to each special venire, the names of all prospective jurors constituting such panel were written upon new scrolls and, in the presence of the court, placed in a box and drawn therefrom by a child under the age of 10 years, the members of each such panel being called for interrogation and re-

jection or selection as jurors in the order in which their respective names were so drawn from the box.

The presiding judge overruled the challenges to the array, reciting that the same findings of fact, made by him with reference to the grand jury in passing upon the motions to quash the bills of indictment, applied equally to the petit jurors chosen from the regular panel and from the first three special venires, all of which were drawn from the jury box. As to the defendants' challenges to the fourth and fifth special venires, not drawn from the jury box, the court found as facts that Lt. Allred is the regular officer in charge of the service of such writs, that the names chosen from the tax lists in High Point by him were chosen at random, that he did not know any of the persons whose names were so chosen or any of the 50 persons who were summoned in response to each such venire *facias,* and that each such person was chosen in the usual and regular manner without regard to race, approximately 12 members of the Negro race being included in each such special venire of 50. Accordingly, the challenges to the fourth and fifth special venires were overruled and denied.

## OTHER PRETRIAL MOTIONS.

In apt time, the defendants moved for separate trials. Conversely, the solicitor moved to consolidate the four indictments for trial. The solicitor's motion was allowed.

In apt time, the defendants moved that a jury be drawn from a county other than Guilford on the ground that the alleged offenses had received so much publicity and attention in Guilford County that a fair and impartial jury could not be obtained therein. This motion was denied.

For the purpose of introducing evidence in support of his contention that the statute of North Carolina providing for the death penalty upon conviction of rape was unconstitutional, in that it has been applied in North Carolina in a manner such as to discriminate against Negro males, the defendant Yoes caused to be issued certain subpœnas *duces tecum* for the clerks of the superior courts of various counties other than Guilford, and for the Director of the North Carolina State Prison System. Upon motion of the solicitor, these subpœnas *duces tecum* were quashed and the court refused to hear evidence as to the number of prosecutions for rape, the race of the defendants so prosecuted, and the number of white and Negro males sentenced to death for this offense in counties other than Guilford.

### SELECTION OF THE TRIAL JURY.

More than 250 prospective jurors were called into the box and examined in the process of selecting the 12 who were empaneled and who rendered the verdicts. In the course of the examination of those prospective jurors, each defendant excepted to numerous denials of his challenges for alleged cause. Each defendant exhausted the peremptory challenges allowed him.

The defendants also entered numerous exceptions to questions propounded by the court to prospective jurors and explanations of the law by the court in the course of such interrogations with reference to the meaning of questions propounded by the solicitor or by counsel for a defendant.

The defendants interposed numerous other exceptions to the allowance by the court of a challenge for cause by the solicitor to each prospective juror who stated that he or she was conscientiously opposed to capital punishment, and therefore could not render a verdict which would result in the imposition of a death sentence, and to the court's permitting the solicitor to ask prospective jurors questions concerning such conscientious objection to the death penalty.

### ASSIGNMENTS OF ERROR.

The defendants assign as error each of the above rulings of the trial court, various portions of and alleged inadequacies in the charge and other rulings at the trial, which are set forth in the opinion.

*Attorney General Bruton, Staff Attorney Vanore and Staff Attorney Partin for the State.*
*Elreta Melton Alexander for appellant Yoes.*
*Jordan J. Frassineti for appellant Hale.*
*Konrad K. Fish for appellant Davis.*

LAKE, J. The crime of which these defendants were found guilty in the superior court is deemed by the law of this State to be unsurpassed by any other in its vicious nature or in its threat to a peaceful, well ordered society. The accumulated wisdom and experience of the people of North Carolina have caused them, in the Constitution of this State and through their representatives in the General Assembly, to declare this crime to be the equal in seriousness to cold-blooded, premeditated murder, and to provide by law that one found guilty of it shall be put to death unless the jury which so convicts him sees fit, in its discretion, to make his punishment imprisonment for the remainder of his life. N. C. Constitution,

Article XI, § 2; G.S. 14-21. It has been the experience of this State that no other offense is so likely to inflame the people of a community to the point of taking the punishment of the offender into their own hands without invoking judicial processes.

The interest of the State in the protection of its innocent people both from such criminal acts and from the resulting incitement to lawless reprisal, as well as the severity of the penalty to be imposed in event of a conviction, require the trial and the appellate courts to observe carefully the established procedures for the determination of the guilt or innocence of one so charged. When there has been a substantial and prejudicial departure from those procedures in a trial resulting in the conviction of the accused, it is the duty of this Court, upon an appeal by the defendant to it, to set aside such conviction and the resulting judgment, irrespective of our opinion as to the guilt or innocence of the accused, and, thereupon, to direct his release from custody or the remanding of the case to the superior court for such further proceeding as may be in accordance with the law of this State. Consequently, we have considered carefully each assignment of error by these defendants.

### The Motions to Quash — Alleged Racial Discrimination.

It is axiomatic that a trial of an accused person in a court which has no jurisdiction of the matter cannot result in a valid determination of his guilt or innocence of the offense with which he is charged. Consequently, a judgment rendered by such court is void and, upon appeal, must be vacated irrespective of the sufficiency of the evidence presented in the trial court to establish the guilt of the accused.

A valid indictment is a condition precedent to the jurisdiction of the superior court to determine the guilt or innocence of a defendant accused of this or any other capital felony and to the authority of the court to render a valid judgment in the matter. N. C. Constitution, Article I, § 12; State v. Bissette, 250 N.C. 514, 108 S.E. 2d 858; State v. Thomas, 236 N.C. 454, 73 S.E. 2d 283; State v. Beasley, 208 N.C. 318, 180 S.E. 598. An indictment returned by a grand jury not legally constituted is not a valid indictment. Consequently, "A valid indictment returned by a legally constituted grand jury is an essential of jurisdiction." State v. Wilson, 262 N.C. 419, 137 S.E. 2d 109; State v. Covington, 258 N.C. 501, 128 S.E. 2d 827; State v. Morgan, 226 N.C. 414, 38 S.E. 2d 166.

In apt time, i.e., before pleading to the indictment, each of the appellants moved to quash the bill of indictment returned against him on four distinct grounds: (1) The grand jury which returned

the bill of indictment, was illegally constituted for the reason that persons of the Negro race were, and have been for the past several years, arbitrarily and systematically excluded from service upon the grand jury, each of these defendants being a Negro; (2) the grand jury which returned the bill of indictment was illegally constituted because its members were not selected in accordance with the statutes of this State; (3) G.S. 14-21 is unconstitutional in that it permits the imposition of the death penalty upon a conviction for rape without the taking or endangering of a life; and (4) this statute is unconstitutional because it is enforced in a discriminatory manner against Negro defendants.

We are directed to no authority supporting the position of the defendants upon their third ground for the motion to quash the bills of indictment. The imposition of the death penalty upon conviction of the crime of rape is not unconstitutional *per se*. Being specifically authorized both by the Constitution of this State and by the statute, it is not cruel and unusual punishment in the constitutional sense. *State v. Daniels,* 197 N.C. 285, 148 S.E. 244. The fourth ground for the motions to quash is equally untenable. G.S. 14-21, imposing the penalty of death upon conviction of rape, unless the jury at the time of rendering its verdict recommends that the punishment shall be imprisonment for life, applies to all persons convicted of the offense, without discrimination on account of the race of the convicted defendant or the race of the victim. Obviously, an allegation of discriminatory enforcement of the statute cannot be established by a tabulation, even if accurate and complete, of results reached in different cases tried in different courts before different juries upon evidence which necessarily varies from case to case. This contention of the defendants is clearly without merit, and there was no error in the quashing of their subpoenas *duces tecum* to clerks of the courts of other counties and in the refusal to hear such purported evidence of discriminatory enforcement of the statute. We turn, therefore, to their contentions with reference to the legality of the grand jury which returned the bills of indictment against them.

In *State v. Lowry* and *State v. Mallory,* 263 N.C. 536, 139 S.E. 2d 870, Moore, J., speaking for a unanimous Court, said, "This Court has held in a long and unbroken line of cases beginning with *State v. Peoples,* 131 N.C. 784, 42 S.E. 814 (1902), that arbitrary exclusion of citizens from service on grand juries on account of race is denial of due process to members of the excluded race charged with indictable offenses." To the same effect, see: *State v. Wilson, supra; State v. Arnold,* 258 N.C. 563, 129 S.E. 2d 229, reversed on another ground in *Arnold v. North Carolina,* 376 U.S. 773; *State v. Miller,*

237 N.C. 29, 74 S.E. 2d 513; *State v. Brown,* 233 N.C. 202, 63 S.E. 2d 99. Consequently, the indictment of a Negro defendant by a grand jury from which members of the defendant's race have been intentionally excluded on account of their race is not a valid indictment and confers upon the court no jurisdiction to determine the defendant's guilt or innocence of the offense charged in the indictment. *State v. Covington, supra; State v. Perry,* 250 N.C. 119, 108 S.E. 2d 447; *State v. Speller,* 229 N.C. 67, 47 S.E. 2d 537; *State v. Koritz,* 227 N.C. 552, 43 S.E. 2d 77, questioned on another point in *State v. Brunson,* 229 N.C. 37, 47 S.E. 2d 478.

This is true by reason of Article I, § 17, of the Constitution of North Carolina, as well as by reason of the provisions of the Fourteenth Amendment to the Constitution of the United States. So far as this State is concerned, this principle of the law did not originate with the decisions of the Supreme Court of the United States. As long ago as 1879, Smith, C.J., speaking for a unanimous Court, in *Capehart v. Stewart,* 80 N.C. 101, said, "The law knows no distinction among the people of the State in their civil and political rights and corresponding obligations and none such should be recognized by those who are charged with its administration." Applying that principle, the Court said in the *Capehart* case that a judge may not direct the sheriff in summoning a tales juror to summon a member of a specified race. It was not until the following year that the Supreme Court of the United States, in *Strauder v. West Virginia,* 100 U.S. 303, 25 L. Ed. 664, by a divided Court, held invalid a West Virginia statute expressly limiting jury service to members of the white race. Since that early date there has been no conflict between the decisions of that Court and this concerning this basic principle and its fundamental corollaries, though there have, on occasion, arisen differences of opinion as to the proper application of these rules to the facts of a particular case.

Through the years since 1879, the following rules have been evolved and declared in cases before this Court and are now deemed by us elementary.

A jury list is not discriminatory, and a grand jury drawn therefrom is not unlawful, merely because it is made from the tax list of the county. *State v. Lowry* and *State v. Mallory, supra; State v. Wilson, supra; Brown v. Allen,* 344 U.S. 443, 73 S. Ct. 397, 97 L. Ed. 469. It is not required that the Negro race be represented on a jury panel in the same ratio to the total membership as the Negro population of the county bears to the total population. *State v. Lowry* and *State v. Mallory, supra; State v. Wilson, supra; State v. Miller, supra;* 24 Am. Jur., Grand Jury, § 27; 38 C.J.S., Grand Juries, § 12. "It is not the right of any party * * * to be tried

[or indicted] by a jury of his own race, or to have a representative of any particular race on the jury. It is his right to be tried by a competent jury from which members of his race have not been unlawfully excluded." Stacy, C.J., speaking for the Court, in *State v. Koritz, supra.* To the same effect, see: *State v. Wilson, supra; State v. Miller, supra; State v. Speller,* 231 N.C. 549, 57 S.E. 2d 759; and *Thiel v. Southern Pacific Co.,* 228 U.S. 217, 90 L. Ed. 1181.

A Negro, moving to quash a bill of indictment on the ground that the grand jury, which returned it was unlawful, because of discrimination against Negroes in its selection, must prove affirmatively that qualified Negroes were intentionally excluded from the grand jury because of their race. *State v. Wilson, supra; State v. Miller, supra; State v. Perry, supra.* This, however, may be shown by circumstantial evidence. Neither a showing that, over a substantial period, in a county with a relatively large Negro population only a few Negroes had served on juries, nor a showing that the race of the persons whose names appeared on scrolls in the jury box was designated on such scrolls, is conclusive proof of arbitrary and systematic exclusion of Negroes from the grand jury which indicted the defendant. A showing of these circumstances does, however, constitute a *prima facie* showing of the discrimination forbidden by the law of this State. Such *prima facie* showing casts upon the State the burden to go forward with evidence sufficient to overcome it. *State v. Lowry* and *State v. Mallory, supra.*

Just as a showing that no Negro served on the particular grand jury which returned the bill of indictment does not make the bill of indictment invalid, so a showing that a Negro did serve on the particular grand jury, or that a token number of Negroes had served on other grand juries, is not necessarily sufficient to rebut a *prima facie* case of unlawful discrimination. *State v. Wilson, supra.*

The practice of designating the race of prospective jurors upon the scrolls in the jury box, either by the words "colored" or its abbreviation, or by the use of different colored scrolls for the names of white and Negro prospective jurors, has been expressly disapproved by this Court. *State v. Lowry* and *State v. Mallory, supra; State v. Speller,* 229 N.C. 67, 47 S.E. 2d 537. Proof that the scrolls in the jury box carried such racial designation does not, however, compel the conclusion that all indictments returned by a grand jury drawn from such jury box are invalid.

The test is not whether a Negro did or did not serve on the grand jury in question, nor is it whether there has been discrimination in the selection of other grand juries in the past. The determinative question is whether, in the selection of the grand jury which returned the indictment under attack, there was or was not

systematic and arbitrary exclusion of qualified Negroes either in the composition of the jury box from which the grand jury was drawn or in the drawing therefrom of the grand jury in question.

Where a *prima facie* showing of such discrimination has been made, as by a showing that the scrolls in the jury box contained racial designation and that for a substantial period in the past relatively few Negroes have served on the juries of the county notwithstanding a substantial Negro population therein, the *prima facie* case is not rebutted by the mere denial by the officials, charged with the duty of administering the selective process, that there was any intentional, arbitrary or systematic discrimination on account of race in the selection of the grand jury. *State v. Wilson, supra; Hernandez v. Texas*, 347 U.S. 475, 74 S. Ct. 667, 98 L. Ed. 866; *Norris v. Alabama*, 294 U.S. 587, 55 S. Ct. 579, 79 L. Ed. 1074. "To overcome such *prima facie* case, there must be a showing by competent evidence that the institution and management of the jury system of the county is not in fact discriminatory." *State v. Wilson, supra.*

In the present case, there was no evidence whatever as to the number of Negroes serving upon grand juries or petit juries in Guilford County prior to the selection of the grand jury which returned these bills of indictment. Thus, there is a complete absence of any basis for a finding that over a substantial period of time there has been only token representation of the Negro race upon the juries of Guilford County. Consequently, there is in this record a complete failure of the proof which the United States Supreme Court deemed determinative with reference to the juries of another county in *Arnold v. North Carolina*, 376 U.S. 773, 84 S. Ct. 1032, 12 L. Ed. 2d 77.

This grand jury was drawn from a panel of 50 names, which panel, in turn, was drawn from the regular jury box. From the same jury box, more than 400 names were drawn for the regular panel and for three of the special venires consumed in the selection of the petit jury which tried these defendants. The record does not contain any direct showing as to the number of Negroes so drawn for service on the petit jury. However, more than 200 of the persons whose names were so drawn were actually called and examined individually in open court as prospective trial jurors in this case. While these prospective jurors were not so called until after the presiding judge had denied the motion to quash, upon his finding of no systematic and arbitrary discrimination against Negroes in the selection of the grand jury, and, therefore, their respective appearances before the trial judge did not serve as a basis for his finding of fact at the time it was made, it is significant that this long pa-

rade of prospective petit jurors constituted a visual demonstration of the racial composition of the same jury box from which this grand jury was selected. We deem it reasonable to conclude that had it thus become apparent that there was only a token sprinkling of Negro names among the 70,000 scrolls contained in the box, the learned judge would have reconsidered the motion to quash the bills of indictment, and we are confident that, in that event, counsel for the defendants would not have left us in ignorance concerning such convincing evidence in support of their contention.

It does appear from the record that when the sheriff was sent by the court to summon another special venire of 50 persons, not from the jury box but from the "body of the county," the deputy, whom the defendants contend was prejudiced against them by reason of his having participated in the investigation of the case, brought in a panel of 50 persons, of whom the presiding judge found that approximately 12 were Negroes. Dispatched by the court to bring in another panel, he again included approximately 12 Negroes among the panel of 50 so summoned.

There is no evidence whatever in this record of discrimination against members of the Negro race, in the selection of the grand jury which indicted these defendants, unless it be found in the fact that upon each scroll in the jury box there appeared certain code numbers taken from the IBM cards in the Tax Department, which code numbers indicated a variety of things about the person named on the scroll. The code numbers "1" and "2" indicated his or her race. Other code numbers indicated other facts, such as the township in which he or she resided. Unquestionably, it would have been better practice to eliminate all such code numbers from all such scrolls. *State v. Lowry* and *State v. Mallory, supra; State v. Speller*, 229 N.C. 67, 47 S.E. 2d 537. We are advised in the record that this has now been done. However, the evidence is conclusive that these code numbers were designated to serve a purpose entirely separate from the selection of jurors. The evidence is also abundant and uncontradicted that no member of the board of commissioners was aware of the significance of the numbers "1" and "2" when the panel from which this grand jury was selected was drawn from the jury box in their presence by a child under the age of ten years.

Two of the 18 members of this particular grand jury were Negroes, this being the same percentage of the total (11%) as the percentage of Negro males in the total number of males listed for poll taxes in the county. There is in the record repeated, and uncontradicted testimony by members of the board of county commissioners, and by other officials participating in the preparation of the jury list and in the selection of the members of this grand jury, not

simply that there was no intentional, arbitrary, systematic exclusion of Negroes from jury service in Guilford County, but that no person whomsoever had been excluded from the jury box by reason of his race.

If the presence of the code numbers on the scrolls in the jury box be deemed a *prima facie* showing of discrimination against the Negro race in the selection of juries, a point which is not necessary for us now to decide, the evidence in this record is abundant, clear and otherwise uncontradicted that there was no systematic or arbitrary exclusion of members of the Negro race from the jury box or from this grand jury on account of race. The uncontradicted evidence is that the name of every person listing property or poll for taxation in Guilford County in 1963 went into the jury box, except for the names purged from the list on account of their lack of good moral character or lack of sufficient mental capacity. There is no evidence whatever that any name placed in the jury box was withdrawn therefrom between the time when it was placed in the box and the time the names of the grand jury which indicted these defendants were drawn from it. There is uncontradicted testimony in the record from the officials of the county that no name drawn from the jury box for the panel from which this grand jury was selected was laid aside for any reason whatever.

These facts clearly distinguish the present case from *Whitus v. Georgia*, 385 U.S. 545, 87 S. Ct. 643, 17 L. Ed. 2d 599. With reference to the contention of racial discrimination, the procedures used in Guilford County for making up the jury list, placing the names in the jury box, and drawing the panel from which the grand jury was selected, were the same as those used in the adjoining county of Forsyth which were found unobjectionable by the Supreme Court of the United States in *Brown v. Allen, supra.*

We conclude, therefore, that the record contains abundant evidence to support the finding by the trial judge that, in the selection of the grand jury which indicted these defendants, there was no arbitrary or systematic exclusion of members of the Negro race. This alleged ground for the motion to quash the bills of indictment is, therefore, utterly without merit.

### The Motions to Quash — Alleged Violations of Statutes.

The remaining ground urged by the defendants in support of their motions to quash is that the provisions of Chapter 9 of the General Statutes were not observed in the selection of the names placed in the jury box and in the securing of the box against tampering with its contents. The pertinent statutory provisions are the following:

G.S. 9-1. *"Jury list from taxpayers of good character. —* The board of county commissioners \* \* \* shall cause their clerks to lay before them the tax returns for the preceding year \* \* \* and a list of names of persons who do not appear upon the tax lists, who are residents of the county and over twenty-one years of age, from which lists the board of county commissioners \* \* \* shall select the names of such persons who reside in the county who are of good moral character and have sufficient intelligence to serve as members of grand and petit juries. A list of names thus selected by the board of county commissioners \* \* \* shall constitute the jury list of the county and shall be preserved as such. \* \* \* There shall be excluded from said lists all those persons who have been convicted of any crime involving moral turpitude or who have been adjudged *non compos mentis.*

G.S. 9-2. *"Names on list put in box. —* The commissioners \* \* \* shall cause the names on their jury list to be copied on small scrolls of paper of equal size and put into a box procured for that purpose, which must have two divisions marked No. 1 and No. 2, respectively, and two locks, the key of one to be kept by the sheriff of the county, the other by the chairman of the board of commissioners, and the box by the clerk of the board."

It is the clear intent of G.S. 9-1 that the county commissioners, themselves, shall examine the lists prepared by their clerical staff and, in the exercise of their own discretion, eliminate therefrom the names of persons found by them to lack either good moral character or sufficient intelligence to serve as grand or petit jurors. Preparatory to the exercise of this discretion, the commissioners may, of course, seek information from the sheriff and his deputies, but for the commissioners to delegate to the sheriff or his deputies the determination of the names to be stricken from the list for these reasons is not in accord with the statutory provision.

G.S. 9-2 specifies the authorized custodians of the box and of the two keys. When this statute is obeyed, the jury box cannot be opened without the joint action of three people, or the breaking of the lock or the removal of the box from the possession of its custodian. The record discloses that these statutory safeguards were not in full effect.

There is nothing whatever in the record to indicate, or to raise the suspicion, that the name of any person, possessing both good moral character and sufficient intelligence to serve as a juror, was stricken from the list by the sheriff or his deputies or by any other

person. Likewise, there is nothing in the record whatever to indicate, or to raise the suspicion, that the jury box was ever opened by anyone, except in the presence of the board of county commissioners for a proper and lawful purpose. There is nothing in the record to indicate the slightest departure from the statutory procedures in the drawing from the jury box of the names of the persons constituting the panel from which this grand jury was selected, or to indicate that any member of it did not possess the full statutory qualifications for service upon the grand jury. Therefore, the question for us to determine is whether the above mentioned departures from the statutory procedures for the compilation of the jury list, prior to the insertion of the names into the jury box, compels the conclusion that the grand jury which returned these indictments was unlawfully constituted so that the bills of indictment returned by it were void.

Far more than a century ago, Ruffin, C.J., speaking of substantially identical statutes adopted in the infancy of our State, said, in *State v. Seaborn,* 15 N.C. 305:

"A perusal of them must satisfy any mind, that all these statutes are directory in their nature. There is not an annulling clause or word in any one of them; and from many of the provisions it must be deduced, that no such consequences of an irregularity was intended. If we advert, for instance, to the very particular directions of (St. 1806, c. 694,) relative to the forming of the jury lists from the tax list, to be furnished by the clerk of the county court; to the writing the names on scrolls of equal size; to the putting them in a box having a certain number of divisions, marks, locks and keys; to the locking the box, *the custody of the keys and of the box;* and to the drawing of the names by a child under a certain age; when I say, we advert to these provisions, and also recollect that many of the matters can by no method get into the record of the Superior Court, and that the statute contemplates that no part of them will get there, by communication from the county court, except the list of jurors to be summoned, that is, the result of all the previous ceremonies; the impression on the mind must amount to conviction, that the enactments are merely directory, and if so, that others upon the same subject in the same statute, or in another statute *in pari materia,* partake of the same character. *But the prevailing consideration is the want of any words importing that the proceeding shall be void, if the directions of the acts be not strictly observed."* (Emphasis added.)

While these remarks of the great Chief Justice were *obiter dicta,* our reports are replete with decisions sustaining the validity of in-

dictments against the charge that the statutory procedures were violated in the compilation of the jury list, the ground of the decision in each case being that the statute was directory and a departure from it does not render the grand jury unlawful, and its actions void, in the absence of a showing of corrupt intent in the compilation of the list or of the presence upon the grand jury of a member not qualified to serve. *State v. Brown, supra; State v. Mallard,* 184 N.C. 667, 114 S.E. 17; *State v. Daniels,* 134 N.C. 641, 46 S.E. 743; *State v. Dixon,* 131 N.C. 808, 42 S.E. 944; *State v. Perry,* 122 N.C. 1018, 29 S.E. 384; *State v. Smarr,* 121 N.C. 669, 28 S.E. 549; *State v. Stanton,* 118 N.C. 1182, 24 S.E. 536; *State v. Potts,* 100 N.C. 457, 6 S.E. 657; *State v. Hensley,* 94 N.C. 1021; *State v. Haywood,* 73 N.C. 437. See also: *State v. Koritz, supra; State v. Fertilizer Co.,* 111 N.C. 658, 16 S.E. 231; *State v. Martin,* 82 N.C. 672.

In addition to the above quoted remarks by Ruffin, C.J., the matter of deviation from the statutory provisions concerning the custody of the jury box and of keys thereto was specifically dealt with in *State v. Potts, supra,* and in *State v. Hensley, supra.* In the latter case, the departure from the statute was far more extensive than that shown in the record before us and the challenge to the panel of jurors drawn from the box was nevertheless overruled.

At the most, the unauthorized acts of the sheriff and his deputies in striking names from the jury list could result in no more than the exclusion from the jury box of the names of some who were qualified to serve. In *State v. Haywood, supra, State v. Perry, supra,* and *State v. Daniels, supra,* an actual showing that qualified persons had been omitted from the box (no question of racial discrimination being involved in those cases) was held not ground for quashing an indictment returned by a grand jury drawn from such box.

The cases of *Moore v. Guano Co.,* 130 N.C. 229, 41 S.E. 293, and *Boyer v. Teague,* 106 N.C. 576, 11 S.E. 665, did not involve irregularities in the compilation of the jury list, but involved irregularities in the handling of names drawn from the box, so flagrant as to raise a strong suspicion of wrongful intent. It is clear that even the county commissioners, themselves, cannot reject a name drawn from the box for service upon a jury panel even on the ground of bad character or lack of mental capacity, this being a power vested in them only while the jury list is being prepared for the insertion of names into the box. *State v. Wilson, supra.* The *Moore* and *Boyer* cases are, therefore, distinguishable from the present case.

In view of the numerous repetitions in the decisions and opinions of this Court of the rule that the statutes setting forth the procedures for the preparation of the jury list are directory only, and that a departure therefrom does not make void a bill of indictment

returned by a grand jury drawn from the jury box, and in view of
the acquiescence by the Legislatures therein, through their silence
over the one hundred thirty-four years since Chief Justice Ruffin
spoke upon the subject, we are unable to reach a different conclu-
sion with respect to the irregularities shown in the present record.
Consequently, this ground urged by the defendants as basis for
their motions to quash the bills of indictment is also held by us
to be without merit, and there was no error in the denial of these
motions. These assignments of error are overruled.

### *Challenges to the Array.*

In due time, the defendants challenged the regular panel of trial
jurors and each special venire drawn from the jury box upon the
same grounds advanced by them as the basis for their attack upon
the grand jury. For the reasons above discussed, those grounds of
challenge to the array are not sustained.

It does not appear in the record, but in oral argument we were
advised by counsel for the defendants that two of the 12 members
of the trial jury (16%, plus) were Negroes. While the racial compo-
sition of the four panels drawn from the jury box does not appear in
the record, it does appear that a total of 220 persons whose names
were so drawn were actually interrogated in open court as prospec-
tive jurors. The presiding judge had this visual evidence before him
when he passed upon each challenge on the ground of racial dis-
crimination. He found no such discrimination and denied the chal-
lenge. The silence of the record and of the defendants' brief upon
this demonstration concerning the composition of the jury box raises
a strong inference that the finding of the presiding judge concern-
ing this question was correct.

An additional ground advanced for the challenge to the regular
panel was that its members were present in the courtroom during
the taking of evidence in support of the motion to quash the bills
of indictment. There is no merit in this contention, the record dis-
closing that nothing was said in those proceedings relating to the
merits of this case.

The defendants also challenged each special venire summoned
from the body of the county pursuant to the order of the court.
Their first ground for this challenge is that the deputy sheriff who
supervised the selection and summoning of these veniremen had par-
ticipated in the investigation of the alleged offense and was a wit-
ness for the State. This is not ground for challenge to the panel of
jurors so selected and summoned. *Noonan v. State,* 117 Neb. 520,
221 N.W. 434, 60 A.L.R. 1118; 31 Am. Jur., Jury, § 108; Anderson
on Sheriffs, § 280.

There was no error in ordering a special venire to be summoned from the body of the county after the exhaustion of three such venires drawn from the jury box. *State v. Stanton, supra.*

The contention that the special venire so summoned by the sheriff was defective because the sheriff, at the time of this activity, knew the significance of the code numbers "1" and "2" upon the tax books from which he selected at random names of those to be summoned, and knew the streets of High Point upon which white and Negro citizens were likely to reside, is without merit. Had the deputy sheriff desired to discriminate between white and Negro citizens in choosing veniremen "from the body of the county," it would not have been necessary for him to rely on code numbers in the tax books to enable him to distinguish between the two races. Obviously, it would be possible for a sheriff, sent out to execute such an order of the court, to discriminate in the selection of the persons to be summoned. This mere possibility does not make the panel actually summoned by him objectionable where, as here, the record shows that he did not so discriminate. The trial judge, having the members of each such special venire before him, found that in each of the two panels, so summoned by the deputy sheriff, approximately 12 of the 50 veniremen were Negroes, a proportion substantially in excess of the proportion of the Negro population to the total population of the county.

The defendants' exceptions to the denial of their challenges to the several jury panels are without merit, and these assignments of error are overruled.

### Other Motions and Rulings.

The motion of the defendants that a jury be summoned from another county was addressed to the sound discretion of the presiding judge. G.S. 1-86; *State v. Allen,* 222 N.C. 145, 22 S.E. 2d 233. The same is true of the motion by the State to consolidate the four cases for trial and the opposing motion by the defendants for separate trials. G.S. 15-152; *State v. Overman,* 269 N.C. 453, 466, 153 S.E. 2d 44; *State v. Hamilton,* 264 N.C. 277, 141 S.E. 2d 506; *State v. Combs,* 200 N.C. 671, 158 S.E. 252. There being nothing in the record to suggest abuse of discretion in the ruling of the court upon any of these motions, these assignments of error are without merit and are overruled.

The motion of the defendants for the sequestration of the witnesses was also addressed to the discretion of the court. *State v. Hamilton, supra.* No abuse of this discretion appears upon the record. There is no merit in the contention of the defendants that

the exclusion of bystanders during the testimony of the prosecutrix denied them the right to a public trial. See *Commonwealth v. Blondin*, 324 Mass. 564, 87 N.E. 2d 455, cert. den. 339 U.S. 984. This was authorized by G.S. 15-166. Representatives of the press and parents of the defendants were not excluded during her testimony. The announcement by the court on the preceding day that it intended to so exclude bystanders when the prosecutrix testified was merely information to the public for its convenience and in no way excluded from the courtroom anyone who wished to attend the proceedings prior to or after the conclusion of her testimony. The record shows that when she took the stand there were bystanders in the courtroom who then left pursuant to the direction of the court. There was no showing of an abuse of discretion in connection with any of these rulings. These assignments of error are overruled.

When the jury announced it had reached a verdict, it was brought back into the courtroom and the foreman stated that as to the defendant Davis the jury found him guilty as charged in the bill of indictment. Before any verdict was announced as to the other defendants, counsel for Davis moved that the jury be polled. Upon the polling, the third juror stated that such was his verdict as to Davis but he recommended mercy. Thereupon, the court sent the jury back for further deliberation, with this comment:

"I'll let the jury go back and make up its verdict. One juror has said he recommends life imprisonment. I'll let you go back and make up your verdict. A verdict must be a unanimous verdict."

The defendants now assign this as error, contending that the import of this instruction was that the jury must return the same verdict as to all four of the defendants. The court in its charge had expressly instructed the jury to the contrary, saying as to each defendant, by name, that the jury might return one of three verdicts: guilty as charged in the bill of indictment, guilty as charged in the bill of indictment with a recommendation for life imprisonment, or not guilty. He instructed the jury:

"Should you find the defendant — and when I say 'defendant', I mean either of them, or all of them, any of them — should you find the defendant guilty of rape, if the evidence is sufficient to satisfy you beyond a reasonable doubt the defendant is guilty of rape and you so find, then the defendant must suffer death unless in the discretion of the jury, in your discretion, you make a recommendation of life imprisonment as authorized by law and from the defendants' standpoint such a

recommendation is not a matter of right in any sense but an exercise of grace based exclusively and unconditionally within the discretion of you, the jury, and no one else; * * * The jury has been entrusted with the State's conscience or power to extend grace with respect to the punishment to be meted out between life and death in capital cases and not the judge nor the solicitor but only you, the jury."

It borders upon the absurd to contend that, in the face of these instructions, the jury understood the court's statement that a verdict must be unanimous to mean that the same verdict must be rendered against each of the four defendants. The action of the court in returning the jury to its room for further deliberation and the returning of a unanimous verdict was not error. *State v. Litteral,* 227 N.C. 527, 43 S.E. 2d 84; *State v. Wilson,* 218 N.C. 556, 11 S.E. 2d 567. These assignments of error are overruled.

There was no error in permitting the solicitor to ask a prospective juror if it would do violence to his conscience to vote for a verdict which carried the penalty of death if the juror was satisfied to a moral certainty and beyond a reasonable doubt from the evidence that the defendants were guilty. *State v. Childs,* 269 N.C. 307, 318, 152 S.E. 2d 453. This is a proper ground for challenge for cause by the State. These assignments of error are overruled.

The defendants' assignments of error relating to interrogatories, remarks and rulings by the court in the interrogation of prospective jurors for the selection of the trial jury occupy 130 pages of the record and are based on 127 exceptions. No useful purpose would be served by discussing these separately or in groups. We find no merit in any of them and these assignments of error are overruled. In numerous instances the assignment of error quotes widely separated portions of the record in such a manner as to give the impression that there is no omission, whereas a voyage of discovery through the record discloses that the statements so placed in the assignment of error were wholly unrelated and occurred in connection with the examinations of different prospective jurors. Obviously, the quotation in an assignment of error of unrelated passages from the record, in such a manner as to indicate no break in the continuity, could easily lead an appellate court into a misconception of what transpired in the trial of the case and should be avoided by counsel. We have carefully studied not only the assignments of error but also the complete record in relation to each of these many exceptions. In no instance do we find any remark of the trial judge which, in its proper context, could reasonably be interpreted as an indication of any opinion whatever concerning the guilt or innocence of the

defendants. On the contrary, the trial court repeatedly and clearly, throughout the examination of the prospective jurors, stated correctly the law of this State with reference to the burden of proof, the elements of the offense charged, the right of the defendants to elect not to introduce evidence and the duty of a juror to consider only the evidence adduced at the trial, as distinguished from newspaper stories and other comments which the juror might have read or heard prior to being summoned as a juror in this action.

We find in the remarks of the trial court during the selection of the trial jury, and at other times in the course of the trial, no support for the contention of the defendants that he expressed in the presence of the jury an opinion upon the facts of the case, or otherwise sought to influence the jury to return a verdict of guilty without a recommendation of a sentence of life imprisonment. If such effort could be found in the language of the judge, it was not successful, for the jury, by its verdict, fixed the penalty at life imprisonment. This distinguishes the present case from *State v. Canipe,* 240 N.C. 60, 81 S.E. 2d 173. These assignments of error are overruled.

The question propounded by counsel for the defendant Yoes to the prospective juror Goolsby, subsequently challenged peremptorily by the defendant Davis without any prior challenge for cause, was apparently designed to determine whether this prospective juror would, under any circumstances, feel justified in returning a verdict of guilty with a recommendation for life imprisonment. The question was not framed so as to elicit that information and did not state as an hypothesis any facts upon which such a recommendation might or might not be deemed justified. The ruling sustaining the objection to the question propounded was not error and this assignment of error is overruled.

The charge of the court to the jury contained a full and fair summary of the evidence and of the contentions of the parties, together with an accurate statement and explanation of the principles of law applicable thereto, with no expression or intimation of an opinion by the court as to whether any fact was or was not sufficiently proved. There is no merit in any of the defendants' several assignments of error thereto and each of them is overruled.

The evidence presented by the State was ample to survive the motion of each defendant for judgment of nonsuit and to support the verdict rendered as to each defendant by the jury. In view of the evidence presented, there was no error in the failure of the trial court to instruct the jury concerning any lesser offense, included within the offense charged in the bills of indictment. *State v. Lentz,*

270 N.C. 122, 153 S.E. 2d 864; *State v. Jones,* 249 N.C. 134, 105 S.E. 2d 513; *State v. Brown,* 227 N.C. 383, 42 S.E. 2d 402; *State v. Jackson,* 199 N.C. 321, 154 S.E. 402.

The prosecutrix positively identified, in the courtroom, each of the four defendants as one of the four men who, in succession, assaulted her on 21 June 1964. She and her male escort both testified that, in the early evening of that day, they were sitting in his automobile, stopped on a lonely road, discussing their plans for getting married when another car drove up and stopped behind them. The evidence is that the four defendants got out of the other car and approached that in which the prosecutrix and her escort sat, two of them on each side. After improper demands upon the prosecutrix, one of the defendants thrust a rifle in the car, threatened to shoot her companion if he did not keep his mouth shut, and ordered him to get out of the car. He did so and struck at the two defendants on his side of the vehicle. In the resulting fight, he was beaten into unconsciousness and thrown or left in the woods nearby. Hale then demanded that the prosecutrix partially disrobe, which she refused to do. Thereupon, the rifle muzzle was put at her temple and the hammer cocked. Again she was instructed to remove her clothing and again she refused, whereupon the defendants did so, pushed her down upon the car seat and, one after the other, the four of them had sexual intercourse with her despite her resistance, the rifle being held pointed into her side meanwhile. During the course of one of these acts of intercourse, a female companion of the defendants was standing beside the car pulling the prosecutrix' hair, trying to strip the ring from her finger, and urging the defendants to kill her, to which they replied, "Wait 'til we get through and we will." Upon this evidence, it is a strain upon credulity to ask us to take seriously the contention that the motion for nonsuit should have been allowed or that the jury should have been instructed concerning the possibility of returning a verdict of a lesser offense.

There could have been no prejudice to the defendants in the court's direction to their counsel that a recording device be removed from the courtroom, since the record plainly shows that the recording device in question was not connected or in operation.

The refusal of the court to allow defendants' counsel to play, in the presence of the jury, an alleged recording of previous statements by the State's witness then under cross examination, which recording had not been authenticated or offered in evidence, was not error. The court did not deny the defendants an opportunity to present evidence contradicting the testimony of the State's witness. The defendants elected, as was their right, to offer no evidence whatever.

They were not entitled to offer evidence of their own, under the guise of cross examination, in the midst of the State's presentation of its case against them. Of course, the defendants had the right to cross examine a witness for the State as to whether such witness had made contradictory statements on another occasion. This right was not denied them. The court specifically stated that if the defendants, at the proper stage of the trial for the introduction of their evidence, desired to call as their witness the person whose voice was purportedly recorded to identify his voice and statement so recorded, they would be permitted to do so. Furthermore, the record does not indicate that the witness, then under cross examination, would have identified the recording as a recording of his voice or as his statement. These assignments of error are overruled.

The jury found each defendant guilty of the offense of rape and recommended that he be punished by imprisonment for life, thus fixing the sentence to be imposed upon him. The evidence is ample to support the conviction as to each defendant. We have carefully considered every assignment of error, and every contention advanced by each defendant, and find therein no reason to disturb the verdict as to any of the defendants or the judgment rendered thereon.

No error.