STATE v. BERTHA MAE WRIGHT, MADELINE PEARSOLL, SARAH MID-
GETTE, PHOEBE PEARSOLL AND FRANCES MARSHALL, CASES #504
AND #513

No. 84

(Filed 30 October 1968)

**1. Criminal Law §§ 146, 174— appeal to Supreme Court from Court
of Appeals — abandonment of assignments of error**

Upon appeal to the Supreme Court from a decision of the Court of
Appeals, assignments of error presented to the Court of Appeals which
are not brought forward to the Supreme Court are deemed abandoned.

**2. Grand Jury § 3— challenge to composition of grand jury**

Upon motion to quash an indictment based on the racial composition of
the grand jury, the validity or invalidity of grand juries selected in years
prior to the return of the indictment against defendant is immaterial if the
grand jury which indicted defendant was properly constituted; if the grand
jury which indicted defendant was not properly constituted, it is immaterial
that the constitutional and statutory requirements were met in the selection
of former or subsequent grand juries.

**3. Grand Jury § 3— evidence of racial composition of previous grand
juries**

Evidence of past practices and of the racial composition of grand juries
selected when those practices prevailed is material only insofar as it tends
to establish the presence or absence of unconstitutional discrimination in
the selection of the grand jury which indicted the defendant on trial, the
probative value of such evidence being diminished or entirely dissipated by
proof of a subsequent material change in the selective process.

**4. Grand Jury § 3— jurisdiction — indictment by improperly consti-
tuted grand jury**

An indictment returned by a grand jury from which persons of defend-
ant's race have been excluded solely because of their race does not confer
jurisdiction upon the superior court to try defendant upon the charge named
in the bill. N. C. Constitution, Art. I, § 17; U. S. Constitution, Amendment
XIV.

**5. Grand Jury § 3— racial composition of grand jury**

A defendant is not entitled to have the charge against him considered by
a grand jury composed entirely or partially of members of his own race, nor
is he entitled to have the grand jury composed of members of the white
and Negro races in proportion to their representation in the county popula-
tion or upon the tax books or other source from which the names on the
jury list were taken, since the State and Federal constitutions merely
forbid eliminating or limiting the representation of members of defendant's
race on the grand jury by intent and design on account of race.

**6. Grand Jury § 3— discrimination in selection of grand jury — bur-
den of proof**

Defendant has the burden of proving discrimination against members of
his race in the process by which the grand jury which indicted him was
selected.

**7. Grand Jury § 3— prima facie showing of discrimination in grand jury selection**

It is not enough for a Negro defendant to show that the names which went into the jury box were taken originally from a source, such as tax lists, which disclosed the race of the persons named therein; where, however, such defendant also shows that throughout a substantial period of years in which essentially the same procedures as those in question were used in compiling jury lists, there was repeatedly a marked discrepancy between the number of Negroes drawn for grand jury service and the number of Negroes whose names appeared on the source material, defendant has made a prima facie showing of unconstitutional discrimination in the selection of the grand jury which places the burden on the State to go forward with competent evidence to rebut the prima facie case.

**8. Grand Jury § 3— rebuttal of prima facie showing of discrimination**

Where defendant has made a prima facie showing of racial discrimination in the selection of the grand jury, the State may rebut the prima facie case by explanation of the discrepancy or by other evidence showing no intentional or designed discrimination against members of defendant's race at any part of the grand jury selection process, a mere denial of wrongful intent not being sufficient for such purpose.

**9. Grand Jury § 3— sufficiency of evidence for prima facie showing of discrimination**

Defendant's evidence that the tax lists and voter registration books used in compiling the jury list designated the race of each person named therein, together with testimony by the county sheriff identifying from one to three members of each grand jury during the preceding ten years who were known by him to be Negroes *is held* insufficient to make a prima facie showing of unconstitutional discrimination against Negroes in the grand jury selection where (1) the sheriff's testimony establishes that virtually every grand jury drawn in the county during the preceding ten years had one or more Negro members, (2) the sheriff did not testify that every other person on the grand jury lists was known by him to be white, and (3) defendant's evidence establishes that a completely new jury list and jury box were prepared the preceding year for the purpose of compiling a more representative jury list, defendant having failed to show repeated substantial discrepancies between the number of Negroes drawn for grand jury duty and the number to be anticipated from those named in the source material during the period when the selective process under attack was in use.

**10. Grand Jury § 3— rebuttal of prima facie case by defendant's own witnesses**

The State may rely upon the testimony of witnesses called by the defendant, including their testimony on cross-examination, to rebut defendant's prima facie showing of unconstitutional discrimination in the grand jury selection.

**11. Grand Jury § 3— inference of intentional exclusion of Negroes rebutted**

Any inference from defendant's evidence of a conscious, intentional, designed exclusion of Negroes from the jury list was rebutted by defendant's further evidence that those who compiled the jury list endeavored to take the names of white and Negro persons from the source materials in approxi-

mate proportion to the number of each race on the tax books, there being no contention that any discriminatory elimination of names occurred after the jury list was compiled.

**12. Witnesses § 4— party may not impeach own witness**

A party may not attack the credibility of his own witnesses. G.S. 8-50(b).

**13. Criminal Law § 175— appellate review — findings of fact**

Findings of fact by the trial judge are binding upon the State appellate courts if supported by evidence.

**14. Grand Jury § 3— defendant's right to have legality of jury box determined**

A person indicted for a criminal offense is entitled to a fair opportunity to have it determined by adequate and timely procedure whether members of his race who are legally qualified to serve as jurors have been intentionally excluded from the grand jury on account of their race or color.

**15. Grand Jury § 3; Judgments § 35— determination of legality of jury box — res judicata**

A determination of the legality of the jury box in the case of one defendant would not be res judicata as against a defendant charged in another indictment.

**16. Grand Jury § 3— examination of names in jury box**

Upon the hearing of a motion to quash an indictment on the ground of racial discrimination in the selection of the grand jury, it was within the discretion of the trial court, having heard for more than an entire day the testimony of defendant's witnesses and having concluded therefrom that there was no intentional, designed exclusion of Negroes from the grand jury which indicted defendant, to refuse to permit defendant to examine the scrolls in the jury box for the purpose of determining the race of the person named thereon, the scrolls containing no racial designation, where an examination of the names in the jury box and testimony as to the race of each would protract the hearing for many days.

APPEAL by defendants from the Court of Appeals.

Upon indictments, proper in form, the defendants were convicted in the Superior Court of Pamlico County of the offense of wilfully and unlawfully resisting, delaying and obstructing the sheriff of the county in his attempt to arrest Bertha Mae Wright upon a capias issued by the clerk of the county recorder's court. Each was sentenced to imprisonment for a time less than the maximum authorized for this offense. By consent the cases were consolidated for trial.

On appeal to the Court of Appeals numerous rulings of the trial court were assigned as errors. The Court of Appeals found no merit in any of these assignments, its opinion being found in 1 N.C. App. 479.

As grounds for appeal to the Supreme Court, the defendants assert:

1. The denial by the trial court of their motions to quash the bills of indictment on the ground of systematic exclusion of Negroes from the grand jury was a violation of the rights of the defendants under the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the Constitution of the United States;

2. The denial by the trial judge of their requests for permission to inspect the jury box, from which the names of the prospective jurors were drawn, was a denial to the defendants of "the effective assistance of counsel," in violation of the Due Process Clause of the said Amendment; and

3. The Court of Appeals erred in its failure to decide whether or not the defendants had made a prima facie showing of unlawful discrimination in the selection of jurors and in its holding that there was no error in the denial of the defendants' request to examine the jury box.

The defendants having moved for a change of venue on the ground of local prejudice, by reason of the popularity in Pamlico County of the sheriff whom they were charged with resisting, the petit jury was, by consent, drawn from Pitt County and the motion for change of venue was denied. The defendants did not and do not take any exception to the method of selection or composition of the petit jury and make no reference in the notice of appeal to the Supreme Court, or in their brief upon such appeal, to any exception to any ruling at the trial on the merits or to the charge of the trial judge to the jury.

Prior to the trial on the merits, the trial court conducted an extensive hearing upon the motion to quash the bills of indictment. Subpœnas were issued for all witnesses whom the defendants requested to be subpœnæd. The clerk to the board of county commissioners was directed to produce in open court, for such hearing, "the jury boxes of Pamlico County to the end that the scrolls in said boxes contained may be examined by counsel for the defendants," by the solicitor and by the court. Other documents, the presence of which was desired by the defendants, were likewise produced.

At the hearing upon the motion the defendants called as their witnesses all members of the present and former boards of county commissioners who had participated in the preparation of any jury list, the former sheriff [the officer whom the defendants were charged with resisting], the register of deeds [ex officio clerk to the board of county commissioners], and two ladies who were employed in

the offices of the sheriff and the register of deeds and who actually compiled in 1966 the jury list in question. The evidence introduced by the defendants in support of their motion and developed on cross-examination of their witnesses, summarized except as indicated, was as follows:

A new jury list was prepared in April 1966, seven months prior to the alleged offenses. It was prepared by the two ladies under the general supervision of the sheriff, who, in turn, was acting under the direction of the board of county commissioners. When so compiled, the list was delivered to the board of county commissioners, who deleted the names of persons known by them to be dead, removed from the county or physically, mentally or morally unfit to serve. Each name remaining on the list was then copied upon a separate scroll of paper and each such scroll was placed in the jury box, the total number being 1,014. Each scroll contained nothing save the name and address of the prospective juror, there being nothing whatever on any scroll to indicate the race of such person. When the time came, in January and April 1967, for drawing the jury panels from which the grand juries in question were taken, the designated number of scrolls was drawn from the box by a child under the age of six years in the presence of the board of county commissioners. The names so drawn were placed upon the jury panel with no exceptions save those known to have died or to have removed from the county or to have become physically incapacitated since their names so went into the jury box. The names of the grand jury were then drawn from this panel as prescribed by statute.

In former years, the names which went upon the jury list, and so into the jury box, were taken from the tax books of the county. For the reason that this practice had resulted in too few women on the jury list, the board directed the sheriff to cause the compilers of the 1966 jury list to use, in addition to the tax books, the voter registration books for the several townships of the county, which was done. The list was compiled in the sheriff's office where the tax books were regularly kept, the sheriff being also the tax collector.

The two ladies were instructed to compile a list of approximately 1,200 names, which they did, taking them from the 1965 tax book for each of the five townships and from the voter registration book for each of the 17 precincts in the county. Each such tax book listed, in alphabetical order, first the white taxpayers and then the Negro taxpayers. Each voter registration book showed the name, residence, age, party affiliation, race, and other identifying data for each registered voter in the precinct.

Without using any system of selection from any page of any tax book, the ladies turned first to the section for white taxpayers and selected names at random. They then turned to the section of the same book for Negro taxpayers and selected names in like manner. This process they repeated for each of the five townships. They then turned to the voter registration book for each of the 17 precincts and, in like manner, selected therefrom names so as to have upon the list more names of women.

One of the ladies testified:

"[W]e used no system, we just went down and selected some names. * * * I went down the list alphabetically in the township both white and colored. * * * When I got back to the alphabetized list for Negro taxpayers, I used the same system as we did for the whites. * * * We would go down and get quite a few of the colored in proportion to the whites. * * * [N]aturally we copied more whites than we did colored because the colored are smaller in number and we took quite a few of the colored people from all of the townships. * * * I think we were instructed to copy along the percentage lines. Now, not exactly the percentage, not going by any percentage, but to get them as near equal as we could. The Sheriff gave those instructions. * * * We tried to equal the proportion of Negroes to whites as best we could. * * * I would say we made an attempt to include from [sic] the list we were preparing approximately one-fourth Negro persons, because I am sure we got that many, if not more. * * * I would say there was [sic] approximately three hundred names of Negro persons on the list we prepared. That would be roughly one-fourth of twelve hundred."

During the 30 years Sheriff Whorton was in office, terminating after the compilation of the jury list in question, there was never anything on the scrolls put into the jury box to indicate the race of the persons whose names appeared thereon. No name drawn from the box was ever discarded unless the person was known to be deceased, too old to serve, or otherwise unable to attend. No name was ever discarded for the reason of race. The sheriff never wilfully failed to summon any person whose name was so drawn.

The sheriff did not recall any term of court at which Negroes did not serve, both on the grand jury and on the petit jury. He testified, "There was at all times a considerable number of people of the Negro race on the petit jury." Taking the Minute Book for each term of court back to 1957, the sheriff pointed out on the list of grand

jurors for each such term one, two or three persons known by him to be Negroes, with the exception of one term in 1957 and one term in 1960. He was not certain as to the race of some other grand jurors whose names so appeared in the Minute Book for sessions of the court in those former years, and so could not testify that there were not additional Negroes on some of such grand juries.

The list, compiled by the ladies and turned over to the board of commissioners for the deletion of names of deceased persons and of those known to be physically, mentally or morally unfit for jury service, contained nothing to indicate the race of any person whose name appeared thereon. No name was stricken from such list because of race. After such revision of the list by the board there remained 1,014 names, all of which were placed in the jury box, each on a separate scroll with no indication of race.

The tax books for 1965, from which the names were so taken by the compilers of the jury list, showed the following numbers of white and Negro taxpayers.

| TOWNSHIP | #1 | #2 | #3 | #4 | #5 | Total |
|----------|-----|-----|-----|-----|-----|-------|
| White    | 957 | 485 | 771 | 437 | 861 | 3,511 |
| Negro    | 86  | 202 | 481 | 0   | 352 | 1,121 |

The voter registration books contained the names of 3,141 white voters and 763 Negro voters, distributed in wide variations among the 17 precincts.

The 1960 Census showed a total of 3,708 white and 1,593 non-white adults in the county.

At the conclusion of the foregoing testimony, counsel for the defendants stated they wanted "to go into the jury box"; that is, examine the 1,014 scrolls therein, one by one, "by letting some citizens in the County who are familiar with the names go through the names rather than do this from the witness stand," so as to determine how many were names of Negroes and how many were names of white persons. The trial judge denied the request, saying, "Well, that would be quite time consuming, and furthermore * * * what person in this county is sufficiently familiar with all of the people whose names appear upon the scrolls to identify them as to whether or not they are members of the white or Negro race." The defendants assign this ruling as error.

The State offered no evidence, but cross-examined the witnesses called by the defendants.

The trial judge made findings of fact from which he concluded that the board of county commissioners, in the preparation of the

jury list, had complied with the applicable statutes; that the use of the tax scrolls and voter registration books in compiling the jury list was not, in itself, discriminatory and the defendants were not entitled to quash the bills of indictment. The motion to quash was therefore denied, which ruling the defendants assign as error.

The material findings of fact by the trial judge were:

"2.  That Pamlico County is a rural county of small size with few small incorporated towns. * * *

"6.  The jury list of Pamlico County was again revised in 1966 and * * * the Board of County Commissioners directed the Sheriff along with the Clerk of the Board of Commissioners or the deputy or the assistant Register of Deeds to compile a list of eligible jurors and submit said list to said Board for approval. The * * * Board of Commissioners desired to have more women in the jury box and authorized and directed the Sheriff who had the tax scrolls in his possession to have the list made from the tax scrolls and from the Voter Registration Books and to submit such list to the Board of Commissioners for its approval or rejection; * * * the Board of Commissioners caused a total of 1,014 scrolls bearing the names of eligible jurors to be placed in the jury box; that said list of 1,014 persons was selected without reference to race or color and that no indicia appears on any scroll of any nature or description that would indicate in any manner the race of any person whose name the scroll bears; that the list from which said jury list was made or copied was made by Mrs. Robert A. Whorton and Mrs. Ida MacCotter, Assistant Register of Deeds, and who in so doing acted for the Register of Deeds who is ex officio Clerk of the Board of County Commissioners. That the actual selection of the jury list was made by the Board of County Commissioners without references to race or color and in substantial accordance with Chapter 9 of the General Statutes of North Carolina.

"7.  The * * * tax scrolls of Pamlico County showed the white taxpayers in the front of the scroll or tax book and the Negroes in the back portion of said each book and said scroll [i.e., the tax books, not the scrolls in the jury box] indicated whether the taxpayer was white or Negro. The Court further finds that the Voter Registration Book shows the name of the voter, first, last and middle, the party he or she affiliated, the sex, the race, whether it was white or Negro, the age, the address, the place of birth of the voter and a space for the notation of

change of party affiliation, that to that extent the person or persons making up the tax list [i.e., the jury list] would have benefit of the knowledge of the race of the proposed juror.

"8. [A]t each term of Superior Court of Pamlico County for the trial of criminal cases over a period of ten years from this date with the exception of the August Term, 1957, and the August Term of 1960, the Grand Juries of each other Term had one to three members of the Negro race who served as Grand Jurors. That at the January Term, 1967 [i.e., the term at which the indictment against Bertha Mae Wright was returned], there were three members of the Negro race upon the Grand Jury. That at the April Term, 1967 [i.e., the term at which the indictment against the other defendants was returned], there was one possibly two members of the Grand Jury who were members of the Negro race.

"9. The Court further finds as a fact and does take judicial notice of the fact that at least two members of the Negro race have served as jurors this week and that on Wednesday a.m. the undersigned at the request of one of them for good and sufficient cause shown excused him for the remainder of the Term.

"10. The Court further finds as a fact that the present and former Board of Commissioners of the County of Pamlico have not systematically excluded members of the Negro race from the jury list of Pamlico County; that the scrolls bearing the name of eligible jurors now in the jury box bear no indicia of any kind or nature or description to identify such person as white or Negro."

*Attorney General Bruton and Deputy Attorney General Moody for the State.*

*J. LeVonne Chambers, James E. Ferguson II and James E. Lanning for defendant appellants.*

LAKE, J.

[1] The two questions for this Court are: (1) Did the trial court err in denying the motions to quash the bills of indictment made on the ground that members of the Negro race were systematically excluded from the jury list from which were selected the grand juries which indicted these defendants? (2) Did the trial judge err in denying the defendants' request "to go into the jury box," at the hearing on the motion to quash, to determine "the numerical break-

down as the names appear in the jury box"? Assignments of error presented to the Court of Appeals relative to rulings made by the trial judge at the trial on the merits were not brought forward to this Court and are, therefore, deemed abandoned. *State v. Williams,* 274 N.C. 328, 163 S.E. 2d 353.

With reference to the first question, we note that we are not concerned here with the procedure now required by statute, and presumably followed in Pamlico County, in compiling the jury list and selecting names to go into the jury box. The General Assembly, at its 1967 Session, completely revised Chapter 9 of the General Statutes and established a new statewide procedure for the compilation of the jury list and the selection of grand and petit jurors. That Act took effect after the drawing of the grand juries which returned these indictments and after the indictments were returned.

It is undisputed that in 1966 a completely new jury list and jury box were compiled and prepared in Pamlico County and the grand juries in question were selected from such then new jury box. The procedure followed in compiling the 1966 jury list was materially different from the procedures used in earlier years. The full extent of the difference does not appear in this record since the procedures formerly used are not set forth in detail. One substantial difference was that in 1966 names were taken from the voter registration books as well as from the tax books — a procedure suggested by this Court in *State v. Lowry and Mallory,* 263 N.C. 536, 139 S.E. 2d 870.

We are, therefore, dealing here neither with the present, the future nor the remote past methods of selecting grand juries in Pamlico County. We have before us for determination the validity of the method of selecting grand juries in use in a narrowly limited period from mid-1966 to early 1967.

**[2, 3]** If the grand juries which indicted these defendants were properly constituted, the judgments before us must be affirmed, irrespective of the validity or invalidity of grand juries selected in years prior to the return of these indictments. Conversely, if the grand juries which indicted these defendants were not properly constituted, it is immaterial that the constitutional and statutory requirements were met in the selection of former or subsequent grand juries. *Cassell v. Texas,* 339 U.S. 282, 70 S. Ct. 629, 94 L. Ed. 839; *State v. Yoes,* 271 N.C. 616, 157 S.E. 2d 386. In *Brown v. Allen,* 344 U.S. 443, 73 S. Ct. 397, 97 L. Ed. 469, the Supreme Court of the United States said, "Assuming that before the *Brunson* case, 333 U.S. 851, there were unconstitutional exclusions of Negroes in this North Carolina county [Forsyth], the present record does not show

such exclusions in this case." See also, *Cassell v. Texas, supra.* Evidence of past practices, and of the racial composition of grand juries selected when those practices prevailed, is material only insofar as such evidence tends to establish the presence or absence of unconstitutional discrimination in the selection of the grand jury which indicted the defendant on trial. The probative value of such evidence is greatly diminished or entirely dissipated by proof of a subsequent material change in the selective processes.

**[4]** It has long been recognized by the courts of this State that an indictment of a defendant by a grand jury, from which persons of the defendant's race have been intentionally excluded solely because of their race, does not confer jurisdiction upon the superior court to try the defendant upon the charge named in the bill. *State v. Yoes,* 271 N.C. 616, 630, 157 S.E. 2d 386; *State v. Lowry and Mallory, supra; State v. Wilson,* 262 N.C. 419, 137 S.E. 2d 109; *State v. Covington,* 258 N.C. 501, 128 S.E. 2d 827; *State v. Perry,* 250 N.C. 119, 108 S.E. 2d 447; *Miller v. State,* 237 N.C. 29, 74 S.E. 2d 513; *State v. Speller,* 231 N.C. 549, 57 S.E. 2d 759; *State v. Peoples,* 131 N.C. 784, 42 S.E. 814. It is well established, by these and numerous other decisions of this Court, that this result is compelled by the Constitution of North Carolina, Art. I, § 17, as well as by the Fourteenth Amendment to the Constitution of the United States. So far as this State is concerned, the recognition of the right of a person to have criminal charges against him considered by a grand jury, from which the members of his race are not excluded by intent and design because of their race, did not originate in decisions of the Supreme Court of the United States. Prior to the decision by that Court in *Strauder v. West Virginia,* 100 U.S. 303, 25 L. Ed. 664, this Court, in *Capehart v. Stewart,* 80 N.C. 101, held that the selection of jurors on the basis of race was forbidden.

As Stacy, C.J., observed, in *State v. Koritz,* 227 N.C. 552, 43 S.E. 2d 77, the controlling principles of both the State and the Federal law in this respect are clear. It is the application of these principles to the facts of the particular case which presents difficulty and causes occasional disagreement among the courts. As the founders of our State reminded us, "A frequent recurrence to fundamental principles is absolutely necessary to preserve the blessings of liberty." Constitution of North Carolina, Art. I, § 29. Consequently, in passing upon this and similar motions to quash bills of indictment, it is desirable to refresh our recollection concerning the basic rules governing the application of the broad constitutional principle invoked by these defendants, even though those rules have already been well estab-

lished by the decisions of this Court and of the Supreme Court of the United States.

**[5, 6]**    A defendant is not entitled to have the charge against him considered by a grand jury composed entirely of members of his own race, or even by a grand jury containing any member of his race. *Cassell v. Texas, supra; State v. Wilson, supra.* It follows that, for an indictment to be valid, it need not have been returned by a grand jury composed by members of the white and Negro races in proportion to the representation of these races in the population of the county, or upon the tax books or other source from which the names upon the jury list were taken. *Brown v. Allen, supra; Akins v. Texas,* 325 U.S. 398, 65 S. Ct. 1276, 89 L. Ed. 1692; *State v. Wilson, supra; Miller v. State, supra; State v. Koritz, supra.* That which is forbidden by the State and Federal Constitutions is the elimination of members of the defendant's race from, or a limitation upon the representation of his race on, the grand jury, which considers the charge against him, by intent and design on account of race. *Hernandez v. Texas,* 347 U.S. 475, 74 S. Ct. 667, 98 L. Ed. 866; *Brown v. Allen, supra; State v. Wilson, supra; Miller v. State, supra.* The burden rests upon the defendant to prove that there was such discrimination against the members of his race in the process by which the grand jury, which indicted him, was selected. *Whitus v. Georgia,* 385 U.S. 545, 87 S. Ct. 643, 17 L. Ed. 2d 599; *Fay v. New York,* 332 U.S. 261, 67 S. Ct. 1613, 91 L. Ed. 2043; *Akins v. Texas, supra; State v. Wilson, supra; State v. Perry, supra; Miller v. State, supra.*

Obviously, if there was intentional discrimination against members of the defendant's race in the compiling of the list of names from which was selected the names which went into the jury box, out of which came the names of the grand jury which indicted the defendant, the indictment is not saved by the purity of the processes used in transferring names from that jury list into the jury box or in drawing names from the jury box. However, the use of tax lists as a source of names to be placed upon the jury list, and then to be put into the jury box, does not render illegal a grand jury drawn from the box, even though the tax lists separated Negro and white taxpayers or otherwise designated their respective races. *Brown v. Allen, supra; State v. Yoes, supra; State v. Lowry and Mallory, supra.*

**[7, 8]**    Thus, it is not enough for the defendant to show that the names which went into the jury box were taken originally from a source which disclosed the race of the persons named in such source material. Where, however, the defendant also shows that, throughout

a substantial period of years, in which essentially the same procedures as those now in question were used in compiling jury lists, there was repeatedly a marked discrepancy between the number of Negroes drawn for grand jury service and the number of Negroes whose names appeared on the source material, such circumstances, in their totality, make out a prima facie case of unconstitutional discrimination in the selection of the grand jury which indicted the defendant. *Whitus v. Georgia, supra; State v. Wilson, supra.* Upon such showing by the defendant, the burden rests upon the State to go forward with competent evidence to rebut the prima facie case, by explanation of the discrepancy or by other evidence showing no intentional and designed discrimination against the members of the defendant's race at any part of the processes culminating in the selection of the grand jury by which he was indicted. *Whitus v. Georgia, supra; State v. Wilson, supra.* Of course, a mere denial of the wrongful intent does not suffice to rebut such prima facie showing of the forbidden discrimination. *Hernandez v. Texas, supra; State v. Wilson, supra.*

[9]    We turn now to the application of these established rules to the facts shown in this record. After showing that the source materials (the tax lists and the voter registration books) used in the compilation of the jury list designated the race of each person named therein, and thus afforded an opportunity for intentional discrimination against members of the defendants' race in the compilation of the 1966 jury list, the defendants called as their witness the sheriff of the county. Taking the court minute book, at the request of the defendants' counsel, the sheriff examined the names of the members of each grand jury selected in Pamlico County in the preceding ten years. In each instance, with the exception of two, he pointed out from one to three members of such grand jury who were known by him to be Negroes.

The defendants contend that this makes out a prima facie case of unconstitutional discrimination within the rule of *Whitus v. Georgia, supra.* On the contrary, this evidence, in its totality, presents a picture quite different from that drawn in the *Whitus* case. First, the sheriff's testimony clearly establishes that, in the preceding ten years, virtually every grand jury drawn in the county had one or more Negro members. Second, he was identifying, merely by reading lists of names from one to ten years old, persons on each such list known by him to be Negro. We do not understand his testimony to be that every other person on each such list was known by him to be white. Notwithstanding the sheriff's claim to have been

well acquainted with the people of his county, which claim we have no doubt was well founded, it is obvious that even a well informed sheriff could not be expected to identify instantly every person whose name appeared on one of many lists compiled several years earlier. Third, it appears from the defendants' evidence, without dispute, that a complete recompilation of the jury list and jury box was ordered by the county commissioners and was accomplished in 1966 for the purpose of compiling a more representative jury list. In the *Whitus* case the evidence was that the jury list and jury box there in question were compiled, in part at least, from an old jury list and jury box previously adjudged illegal because of unconstitutional discrimination against Negroes. In the present case, on the contrary, the 1966 jury list and jury box were completely new and the procedures used in compiling them were described in detail by the defendants' own witnesses, there being no testimony as to the procedures used in former years.

Thus, in the present case, as contrasted with the *Whitus* case, the defendants have not shown repeated substantial discrepancies between the number of Negroes drawn for grand jury duty and the number to be anticipated in view of the number named in the source materials during the period when the selective processes which they attack were in use. Consequently, the defendants did not establish a prima facie case of unconstitutional discrimination against Negroes in the selection of the grand jury by which these defendants were indicted.

[10, 11] Even if it could be said that the defendants offered evidence of long continued discrepancies between the number of Negroes drawn for grand jury duty and the number of Negroes in the county qualified for such duty, the evidence offered by the defendants themselves rebuts any inference of conscious, intentional, designed exclusion of Negroes from the 1966 jury list. The above mentioned rule that, upon the establishment of a prima facie case of unconstitutional discrimination, the burden of going forward with evidence to rebut such showing rests upon the State, does not mean that the State cannot rely for this purpose upon the testimony of witnesses called by the defendants, including the testimony of these witnesses upon cross-examination. If at the close of the defendants' evidence, including the cross-examination of their witnesses, the prima facie case has been rebutted, it is not necessary for the State to call witnesses of its own to gild the lily. This is especially true where, as here, the defendants themselves called as their own witnesses all of the county officials who participated in, or who reasonably could have had knowledge of the processes by which the selection of the grand jury

was made. It would be absurd to require the State then to recall to the stand the same officials to give the same testimony, as witnesses for the State, which they had already given as witnesses for the defendants.

[11, 12]   The processes used in compiling the jury list of 1966 were described in detail by the ladies who compiled that list from the tax and voter registration books. Their testimony is a far cry from a mere denial of intent to discriminate. They testified that, while they used no percentage and no arithmetical formula or system for the selection of names from the source materials, they endeavored to take the names of white and Negro persons in an approximate proportion to the number of each race on the tax books and that, in their opinion, at least one-fourth of the 1,200 names selected by them were names of Negro people. There is no contention that after this jury list was so compiled by these ladies any discriminatory elimination of names occurred. The trial judge observed the demeanor of these witnesses and heard their testimony. In any event, the defendants do not attack their credibility, and, having called them as their witnesses, are not in a position to do so. G.S. 8-50(b); *State v. Tilley,* 239 N.C. 245, 79 S.E. 2d 473; Stansbury, North Carolina Evidence, 2d Ed., § 40.

[13]   The findings of fact by the trial judge are binding upon the appellate courts of this State if supported by evidence. *State v. Wilson, supra; Miller v. State, supra; State v. Walls,* 211 N.C. 487, 191 S.E. 232; *State v. Cooper,* 205 N.C. 657, 172 S.E. 199. The findings of fact by the superior court, set forth in the foregoing statement of facts, are fully supported by testimony of the defendants' own witnesses. Upon the facts so found, there was no error in the denial of the motion to quash the bills of indictment.

[16]   There remains for consideration the defendants' contention that they should have been permitted, in the course of the hearing upon their motion to quash, to "go into the jury box" and to examine the 1,014 scrolls contained therein to determine what proportion of these bore the names of Negroes; there being nothing on the scrolls, themselves, to indicate race.

[14]   It is well settled in this State that one who is indicted for a criminal offense must have "a fair opportunity to have it determined by adequate and timely procedure" whether members of his race, legally qualified to serve as jurors, have been intentionally excluded, on account of their race or color, from the grand jury returning the indictment. *State v. Inman,* 260 N.C. 311, 132 S.E. 2d 613; *Miller v. State, supra.* The two indictments upon which these

defendants were tried were returned by the respective grand juries in January and April 1967. The motions to quash were not filed until the cases were called for trial on 24 October 1967. Even then, it was not until after more than an entire day had been consumed in presentation of testimony by the defendants' witnesses, concerning the processes by which the grand juries in question were selected, that the defendants requested the permission of the trial court to "go into the jury box" and have some citizen or citizens of the county take each of the 1,014 scrolls therein and determine, presumably from personal knowledge or comparison with the tax or voter registration books, the race of the persons whose names appeared thereon.

[15] The trial judge correctly observed that to do what the defendants proposed would require many hours, if not days, of the time of the court. Obviously, if these defendants had such a right, so would every other person charged in Pamlico County with a criminal offense. A determination of the legality of the jury box in the case of one defendant would not be res judicata as against a defendant charged in another indictment. It is equally obvious that if these defendants had such a right so would a defendant in any other county of the State. Pamlico County is a small, rural county with 1,014 names in its jury box. Approximately 70,000 names are contained in the jury box of Guilford County. See *State v. Yoes, supra.* In Mecklenburg County the jury box may well contain in excess of 100,000 names. To hold that these defendants have a legal right, under the circumstances, to examine every scroll in the jury box and determine the race of the person named thereon, would put it in the power of persons charged with criminal offenses to paralyze completely the entire system of criminal courts of this or any other state.

There is ample authority to the effect that the judge presiding at the trial of a law suit may, in his sound discretion, limit the examination and cross-examination of a witness so as to prevent needless waste of the time of the court. See *State v. Stone,* 226 N.C. 97, 36 S.E. 2d 704. After stating that courts have like authority to limit the number of expert witnesses or of character witnesses, Professor Wigmore states:

> "For witnesses upon *any point whatever* a similar rule of limitation may be enforced. * * * The reason for the rule — namely, that the disadvantage of confusion preponderates over the testimony of value, little or none, of the additional witnesses — may come to be applicable at any time * * *
>
> "A Court occasionally declares the rule applicable only where the fact is not actually controverted. But this limitation

is unsound, because the value of merely cumulative witnesses may become trifling even where the point is controverted, and the policy of the rule rests on the proportion between the probative value of the additional witnesses and the disadvantages they bring. * * *

"Sometimes a Court declares the qualification that the limiting of numbers is proper only upon *collateral issues;* though there is little authority for this * * * Moreover, there is no reason here for such a restriction of the rule; the exigency may equally arise upon any part of the issue * * *" Wigmore on Evidence, 3d Ed., § 1908.

In Hyatt, Trials, § 1,003, it is said:

"One of the most important parts of his [the trial judge's] duty is to expedite so far as he can do so, without interfering materially with the rights of the parties, the business of the court. In criminal cases the defendant has not only a constitutional right to a fair and impartial trial, but also to a speedy trial, but apart from this it is the duty of the court, not only in criminal but in civil cases, to so arrange and supervise the public business as to insure a reasonably speedy settlement of questions in which the life, liberty, or property of the litigants before it is involved. * * * The court may in its discretion limit the number of witnesses testifying to a particular fact in a case. * * *"

In Thompson on Trials, § 352, it is said:

"[I]t has been laid down, generally, that where, in the progress of a trial, it appears obvious that a party, either in the examination of his witnesses or in his argument, is consuming time unnecessarily, the court may, in its discretion, arrest the examination; and the exercise of this discretion will not be reviewed unless its abuse manifestly appears. So it is the obvious duty of the judge to interpose his own motion, when a useless and irrelevant examination of the witnesses is going on, and prevent a waste of time and the distraction of the attention of the jury from the real issues."

In § 353 of the same treatise, it is said, "So, a reasonable limitation of the number of witnesses who shall testify to a particular fact is within the discretion of the trial court." To the same effect, see: *Walker v. State,* 240 Ark. 441, 399 S.W. 2d 672; *Gray v. St. John,* 35 Ill. 222, 238; *Dobbs v. State,* 237 Ind. 119, 143 N.E. 2d 99; *Bays v. Herring,* 51 Iowa 286, 1 N.W. 558; *State v. Lee,* 203 S.C. 536, 28

S.E. 2d 402, 149 A.L.R. 1300; *Shields v. State,* 197 Tenn. 83, 270 S.W. 2d 367; *Meier v. Morgan,* 82 Wis. 289, 52 N.W. 174; 53 Am. Jur., Trial, § 107; Annot., 21 A.L.R. 335.

Especially pertinent in the present case is *State v. Whiton,* 68 Mo. 91, in which the trial court limited the witnesses to be heard upon a motion for change of venue on account of local prejudice against the defendant. Sherwood, C.J., speaking for the Court in affirming the ruling, said:

> "We regard such ruling clearly within the domain of judicial discretion, with which, unless arbitrarily and abusively exercised, we should refrain from interfering. * * * Any other theory of the law would permit, nay prompt, a crafty criminal to block the wheels of both punitive and remedial justice, by using the latest census returns of the county as a fecund source of limitless supply for countless subpœnas, thus securing a continuance under the pretense of securing a change of venue. And to those who, from long practice at the bar, are familiar with artifices of criminals, such an one will seem neither impossible nor improbable."

In *Burgman v. United States,* 188 F. 2d 637, cert. den. 342 U.S. 838, 72 S. Ct. 64, 96 L. Ed. 634, the defendant, prosecuted for treason, pleaded insanity as a defense. Upon appeal, he asserted that the trial court had abused its discretion in failing to provide, at government expense, psychiatrists to examine the defendant and testify. Two psychiatrists, who had examined the defendant earlier, in the course of military service, had testified for the defendant and the prosecution had presented another. Speaking for the Court of Appeals for the District of Columbia, Prettyman, Cir. J., said:

> "In the situation which then confronted the court, we think its decision was within its established discretion in such matters. A call of witnesses at Government expense is a matter for the trial court in its sound discretion. Moreover, numerous cases, stemming from *Winans v. N. Y. & Erie R. Co.* [21 How. 88, 16 L. Ed. 68], support the power of the court to limit reasonably the witnesses upon any single point; in other words, to curtail cumulative evidence."

[16] We think it was clearly within the discretion of the trial court, having heard for more than an entire day the testimony of witnesses called by the defendants, and having concluded therefrom that there was no intentional, designed exclusion of Negroes from the grand jury which indicted these defendants, to refuse to permit the

defendants to embark upon a fishing expedition which would, in all probability, be so extensive as to prevent the court from transacting any other business at that term.

Affirmed.