STATE OF NORTH CAROLINA v. CLARK BRINSON AND JOHNNY JOHNSON

No. 53

(Filed 18 November 1970)

1. Grand Jury § 3— composition of grand jury— systematic exclusion of Negroes — prima facie case.

Negro defendants in a first-degree murder prosecution failed to make out a *prima facie* case that members of their race had been systematically excluded from the grand jury, where (1) the defendants merely showed that a disproportionate number of whites sat on a particular jury and that the tax lists from which the jury list was compiled carried racial designations and (2) the defendants produced no population figures, no evidence of disproportionate representation on past juries, and no evidence of actual discrimination.

2. Criminal Law § 15— change of venue — prejudicial pretrial publicity

An article in a local newspaper stating that the defendants' first-degree murder prosecution was among the murder cases on the docket

and that "this is the third or fourth time they have been up and not been tried," *is held* insufficient to support defendants' motion for change of venue on ground of prejudicial pretrial publicity.

3. **Criminal Law §§ 76, 95, 169— joint trial of defendants — admission of statements implicating codefendant — harmless error rule**

In a joint trial of two defendants for first degree murder, it was error to admit statements from the confession of each defendant which implicated his codefendant, neither defendant having taken the stand in his own behalf; nevertheless, such error was not prejudicial where the objectionable statements were merely cumulative of other and overwhelming evidence of the defendants' guilt and could not have had a significant impact upon the average juror.

4. **Constitutional Law § 30; Criminal Law § 167— federal constitutional errors — prejudicial effect**

Not all federal constitutional errors are prejudicial.

5. **Criminal Law § 117— scrutiny of accomplice's testimony — instructions**

Failure of the court to caution the jury to scrutinize the testimony of defendant's accomplice is not erroneous where the defendant made no request for such an instruction.

APPEAL by defendants from *Bundy, J.,* at the June 1965 Mixed Session, HALIFAX Superior Court.

Arthur Harper, Clark Brinson and Johnny Johnson were charged in separate bills of indictment with the first degree murder of Elmer M. Taylor in Halifax County on 18 December 1964. Harper pleaded guilty and testified as a witness for the State. The cases against Brinson and Johnson were consolidated for trial. They were convicted by the jury and sentenced to life imprisonment. Notice of appeal was given but the appeal was never perfected. Following a post conviction hearing before Judge Peel, an order dated 12 June 1970 was entered allowing defendants to perfect a belated appeal, and counsel was appointed to represent them. The case is now before us for appellate review.

The State's evidence tends to show that Elmer M. Taylor owned and operated a store located on a rural road in Halifax County. Several people including Arthur Harper worked at the store. Mrs. Taylor was having an affair and had been using Arthur Harper to carry notes and arrange meetings between her and a man named Sam Alford. She wanted her husband killed and picked Arthur Harper as the man to do it. He refused and later quit work at the store when Mr. Taylor accused him of bringing liquor to Mrs. Taylor. Thereafter Clark Brin-

son carried letters from Mrs. Taylor to Harper in which she told Harper how much insurance her husband had taken out and stated that all insurance and everything left to her would be Harper's if he killed her husband. Harper replied that he didn't want the store or anything Mrs. Taylor had. A few days later Clark Brinson brought Harper some cigarettes, pants and shirts from Mrs. Taylor. At the time of the killing she had given him $250 to $260.

When Harper got his crops harvested about the middle of December, he left Halifax County and went to Philadelphia. His wife called and when Harper returned the call, "Mrs. Taylor answered the phone and asked me where I was. She said . . . 'You had better come back here and do what you was told to do.' As a result of that telephone conversation I came back down to Halifax County."

During the week following his return from Philadelphia, Arthur Harper, Clark Brinson and Johnny Johnson had a conversation about Elmer M. Taylor while sitting in a car in front of Taylor's store. Brinson said: "There's more than one way to get him and not have to put your hands on him." Brinson called attention to the fact that Taylor habitually carried certain employees home at night. All three of them knew of this practice. Harper decided at that time to kill Taylor.

Shortly thereafter, on Friday night, December 18, when Harper was at his mother's home, Clark Brinson and Johnny Johnson came for a brief visit, then left and went to Taylor's store. "When they came back they made a sign to me, winked at me," and the three of them left the house. Brinson and Johnson went up the road in Brinson's car and Harper followed on foot. They knew that Taylor would pass along that road driving Harper's stepfather home. They hid in the woods and when Taylor passed they piled pieces of wood in the road to block passage on his return. It was about 9:00 or 9:30 p.m. Shortly thereafter Taylor came back down the road, drove up to the wood and stopped. When he got out of his vehicle Arthur Harper shot him from ambush with a .22 caliber rifle. Both defendants were there in the woods with Harper. "At the time I did the shooting somebody was behind me but nobody was persuading me. . . . Clark Brinson and Johnny Johnson were behind me."

After he was shot Taylor reentered his vehicle and Harper fired again. Taylor drove to his home where officers called an ambulance and a doctor. Taylor later died and it was stipulated at the trial "that Elmer M. Taylor died as a result of a .22 caliber bullet being fired into his body."

SBI Agent J. P. Thomas, after advising defendants of their rights, interrogated them separately and then together. Defendant Brinson stated that he and Johnny Johnson got together in Brinson's car on the day of the shooting; that they went to the home of Harper's mother and then left in the car and went to the scene of the shooting; that Arthur Harper followed them on foot; that all three of them assisted in placing wood in the road to block it; that they saw Taylor go by and blocked the road so he would stop when he returned; that Taylor was shot when he got out of his truck to remove the wood; that after the shooting he and Johnson left in Brinson's car and were not with Harper any more that night.

Defendant Johnson stated that he and Brinson traveled in Brinson's car to the home of Harper's mother; that he and Brinson left in Brinson's car and Harper followed on foot; that they all went to the same location and all three participated in blocking the road with wood after they had seen Taylor go by carrying an employee home; that when Taylor returned and got out to remove the wood a shot was fired and Taylor fell against his truck; that Taylor then got in his truck and left the scene whereupon he and Brinson left.

The foregoing statements were made by Brinson and Johnson in the presence of each other. Both told where each was standing when the shots were fired—Harper behind a poplar tree, one of defendants behind an oak tree and the other defendant behind a pond—"They said there was no water but they called it a pond, all in the same immediate area." These statements were offered in evidence over objection by defendants.

The bullet found in the victim's body was tested by a ballistics expert who determined that it had been fired from the .22 rifle Arthur Harper had used.

Neither defendant testified, but they offered evidence in the nature of alibi. Defense witness Otto Brinson, sixteen-year-old brother of Clark Brinson, testified that Clark Brin-

son and Johnny Johnson came to his father's home at 9:20 p.m. on the night in question, stayed ten or fifteen minutes, and that he left with them to go to the store for cigarettes; that they returned to his father's home, watched television awhile, and then went to the Friendly Grill in Enfield and bought drinks; that they returned home about 11:00 p.m., then carried Johnny Johnson home, and that Clark Brinson returned home with the witness and went to bed. The witness stated that Clark Brinson and his wife and children were living there at that time.

Jasper Brinson, father of Clark Brinson and Otto Brinson, testified that Clark Brinson and Johnny Johnson came to his home about 9:10 p.m. on December 18, stayed a few minutes and left with Otto; that they returned with some drinks about 11:05 p.m., watched television and, when the late show went off, went to their rooms to go to bed.

Emma Lee Johnson, wife of Johnny Johnson and sister of Clark Brinson, testified that she worked for Mrs. Taylor on December 18, 1964; that defendants came in the store about 9:20 p.m., bought something and left; that they came back about 9:30 p.m. and left again saying they were going home "to my father's where my children were"; that she next saw her husband about 11:10 or 11:15 p.m. that night when Clark Brinson brought him home. On cross examination this witness said that Mr. Taylor did not close the store until 10:30 p.m. and that he took her home "about five minutes to eleven on that Friday night"; that from 9:30 p.m. until 11:10 p.m. she did not know the whereabouts of her husband; that neither he nor Clark Brinson were at her father's house when she arrived at "a quarter to eleven."

Julius Lee Brinson, twelve years old, testified that he saw Clark Brinson and Johnny Johnson that night at his father's house; that he went to Taylor's store and back home that night—"Clark and Johnny and me and Otto were in the car"; that they returned home and went to the store a second time but found it closed and went to the Friendly Grill in Enfield to buy drinks; that the four of them returned home, took Johnny Johnson home, watched television and then went to bed.

The jury returned a verdict of guilty recommending life imprisonment, and from judgment pronounced thereon de-

fendants appealed to the Supreme Court assigning errors noted in the opinion.

*Parker & Dickens by William F. Dickens, Jr., Attorney for Defendant Appellant Johnson; Charlie D. Clark, Jr., Attorney for Defendant Appellant Brinson.*

*Robert Morgan, Attorney General; Burley B. Mitchell, Jr. and Charles A. Lloyd, Staff Attorneys, for the State.*

HUSKINS, Justice.

[1]  Defendants' first assignment of error is based on denial of their motion to quash the bills of indictment. Defendants are Negroes and allege that members of their race had been systematically excluded from the grand jury.

The question of systematic exclusion of Negroes from grand juries has been repeatedly considered by this Court, most recently in *State v. Spencer,* 276 N.C. 535, 173 S.E. 2d 765 (1970). There we outlined the familiar rules of law applicable to such situations. We said that the conviction of a Negro based on an indictment or verdict of a jury from which Negroes were systematically excluded because of their race cannot stand. The burden is on the defendant to establish such racial discrimination; once a *prima facie* case is established, the burden of going forward with rebuttal evidence is on the State. A defendant must be allowed a reasonable opportunity to present evidence regarding the alleged exclusion, and failure to do so is reversible error. See *State v. Spencer, supra,* and cases cited therein.

In rebutting the evidence of a defendant that there has been such systematic discrimination, the State may not rely on general assertions that its officers performed their statutory duties in good faith. There are further affirmative duties: "First, they are obliged, as a constitutional duty of their office, to familiarize themselves with all of the community's elements in which qualified jurors may be found so as to make certain that none is omitted from full and equal consideration for jury service. Second, they may not pursue a 'course of conduct' which, whether so intended or not, has the natural tendency to exclude a group that may not be constitutionally excluded." Roger S. Kuhn, Jury Discrimination: The Next Phase, 41 So. Cal. L. Rev. 235 at 258 (1968) ; *State v. Wilson,* 262 N.C. 419, 137 S.E. 2d 109 (1964) ; *State v. Lowry and Mallory,* 263 N.C. 536, 139 S.E. 2d 870 (1964) ; *Avery v. Georgia,* 345 U.S. 559, 97 L. Ed.

1244, 73 S. Ct. 891 (1945) ; *Hill v. Texas,* 316 U.S. 400, 86 L. Ed. 1559, 62 S. Ct. 1159 (1942) ; Annotation, Proof as to exclusion of or discrimination against eligible class or race in respect to jury in criminal case, 1 A.L.R. 2d 1291 (1948).

What is necessary to establish a *prima facie* case of systematic exclusion by reason of racial discrimination? In *Avery v. Georgia, supra,* a *prima facie* case was established by showing that the population of the county in question was twenty-five percent Negro; that the tax list from which jurors were chosen was fourteen percent Negro; that the resulting jury list was five percent Negro; that names drawn were typed on white or colored paper, according to race; and that only a negligible number of Negroes were ever called to jury duty. In the venire in question, all sixty jurors were white. In a Fourth Circuit case, *Witcher v. Peyton,* 382 F. 2d 707 (1967), the following situation was deemed sufficient to establish a *prima facie* case: "Of the thirty-seven grand juries impaneled from January 1957 through September 1962, ten were white, and none of the other twenty-seven included more than one Negro juror."

North Carolina cases follow the same pattern. In *State v. Lowry and Mallory, supra,* "[d]efendants made out a *prima facie* case of systematic exclusion by showing the population ratio and that only a token number of Negroes had served on the grand jury, never more than one on any grand jury, sometimes none, and that such Negroes as were approved on the biennial list were designated 'col.' " In *State v. Brown,* 271 N.C. 250, 156 S.E. 2d 272 (1967), it was suggested that the fact that only three out of eighty-six jurors called in two successive months were Negroes in a county where the Negro population was 5,106 and the white population was 56,360, was not sufficient to make out a *prima facie* case. In *State v. Wright,* 274 N.C. 380, 163 S.E. 2d 897 (1968), it was held insufficient to show that the sheriff of the county could identify, from the jury lists of the last ten years, only one to three Negroes on each grand jury, with the exception of two grand juries from which he could identify no Negroes. There, as here, the lists from which the jury list was taken carried racial designations pursuant to statute.

What must be shown is a systematic course of conduct resulting in apparent systematic discrimination against persons of the defendant's race. Thereupon the State must go forward and explain the apparent discrimination. *State v. Wright, supra.*

Merely showing that names on the tax lists from which the jury list is compiled carry racial designations, and that there were a disproportionate number of whites on *a particular jury,* is insufficient. Here, movants produced no population figures, no evidence of disproportionate representation on past juries, and no evidence of actual discrimination. This assignment is overruled.

The problem of unequal treatment of minorities in an imperfect judicial system is a continuing one and will not likely be eradicated as long as the human mind plays a role in it. Even so, the revision of jury selection procedures embodied in Chapter 218 of the 1967 Session Laws, codified as Chapter 9 of the General Statutes, is designed to remove, within the bounds of practicality, any likelihood of discrimination in the selection of jurors in North Carolina.

For interesting discussions of refined but impractical techniques designed to establish *prima facie* discrimination in jury selection and suggesting various remedial approaches to the problem, see Finkelstein, The Application of Statistical Decision Theory to the Jury Discrimination Cases, 80 Harv. L. Rev. 338 (1966) ; *Kuhn, supra,* pp. 266-282.

[2] Defendants next assign as error the refusal of the court to order a change of venue based on prejudicial pretrial publicity amounting to a denial of due process. The record discloses that an article in a local newspaper had stated that "there were several murder cases on the docket and among them were these and that this is the third or fourth time they have been up and not been tried." Nothing else is offered. The showing presents nothing approaching prejudicial pretrial publicity. The motion was properly denied. *Sheppard v. Maxwell,* 384 U.S. 333, 16 L. Ed. 2d 600, 86 S. Ct. 1507 (1966).

[3] Each defendant contends his constitutional rights were violated in that the trial court admitted in evidence the extrajudicial confessions wherein each implicated the other in the crime for which they were both on trial. Each asserts this violated his Sixth Amendment right "to be confronted with the witnesses against him." This constitutes defendants' third assignment of error.

At the time these defendants were tried in 1965 it was permissible in both state and federal courts to admit the extrajudicial confession of one defendant, even though it implicated

a codefendant against whom it was inadmissible, provided the trial judge instructed the jury to consider the confession only against the confessor. *State v. Lynch,* 266 N.C. 584, 146 S.E. 2d 677 (1966) ; *State v. Bennett,* 237 N.C. 749, 76 S.E. 2d 42 (1953) ; *Delli Paoli v. United States,* 352 U.S. 232, 1 L. Ed. 2d 278, 77 S. Ct. 294 (1957). But this is no longer the rule. Since the trial of this case, the United States Supreme Court in *Bruton v. United States,* 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968), overruled *Delli Paoli* and held that in a joint trial the admission of the confession of one defendant who did not take the stand, implicating his codefendant, violated the codefendant's right of cross examination secured by the Confrontation Clause of the Sixth Amendment. The decision in *Bruton* is retroactive, *Roberts v. Russell,* 392 U.S. 293, 20 L. Ed. 2d 1100, 88 S. Ct. 1921 (1968), and the right of confrontation is made obligatory on the states by the Fourteenth Amendment to the Federal Constitution. *Pointer v. Texas,* 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065 (1965). These principles were recognized and applied by this Court in *State v. Fox,* 274 N.C. 277, 163 S.E. 2d 492 (1968), and *State v. Parrish,* 275 N.C. 69, 165 S.E. 2d 230 (1968).

In *State v. Fox, supra,* the post-*Bruton* rule in North Carolina was summarized by Sharp, Justice, as follows:

"The result is that in joint trials of defendants it is necessary to exclude extrajudicial confessions unless all portions which implicate defendants other than the declarant can be deleted without prejudice either to the State or the declarant. If such deletion is not possible, the State must choose between relinquishing the confession or trying the defendants separately. The foregoing pronouncement presupposes (1) that the confession is inadmissible as to the codefendant (see *State v. Bryant, supra* [250 N.C. 113, 108 S.E. 2d 128 (1959)]), and (2) that the declarant will not take the stand. If the declarant can be cross examined, a codefendant has been accorded his right to confrontation."

In the instant case, Brinson and Johnson were together when they confessed, and the statement of each was made in the presence of the other. The State contends this rendered each confession competent against both defendants, relying on *State v. Bryant, supra,* referred to by Justice Sharp in the *Fox* case. There, seven defendants were charged in separate bills

State v. Brinson

of indictment with the crime of rape. The solicitor's motion to consolidate all seven cases for trial was allowed over objection and defendants assigned the ruling as error. Speaking to that assignment the Court said: ". . . [A]ll of the defendants who were convicted by the jury were together when they made their confessions, and each defendant, according to the evidence, expressly admitted in the presence of the others that he did have sexual intercourse with the prosecuting witness, forcibly and against her will. This assignment of error is overruled." The *Bryant* case therefore is authority only for the propriety of the consolidation. It is not pertinent on the question of admissibility of the extrajudicial confession of one defendant which implicates a codefendant when the confessor does not take the stand. The rule now applicable in North Carolina was dictated by *Bruton,* declared by Justice Sharp in *State v. Fox, supra,* and reaffirmed in *State v. Parrish, supra.* Applying that rule to the facts here, we hold that it was error to admit those portions of Brinson's confession that implicated Johnson and those portions of Johnson's confession that implicated Brinson. Neither defendant took the stand, and each was therefore denied his constitutional right of confrontation and cross examination guaranteed by the Sixth and Fourteenth Amendments.

[4] Nevertheless, all federal constitutional errors are not prejudicial. Some constitutional errors in the setting of a particular case "are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction. . . . [B]efore a federal constitutional error can be held harmless, the Court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967). In deciding what constituted harmless error in *Fahy v. Connecticut,* 375 U.S. 85, 11 L. Ed. 2d 171, 84 S. Ct. 229 (1963), the Court said: "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." In a factual situation similar to the case before us, the harmless constitutional error test fashioned by *Chapman* was applied in *Harrington v. California,* 395 U.S. 250, 23 L. Ed. 2d 284, 89 S. Ct. 1726 (1969).

[3] Applying the foregoing standard to the facts in this case, we hold that the admission of those portions of Brinson's and Johnson's confessions wherein each implicated the other was harmless beyond a reasonable doubt. Brief analysis of the com-

petent evidence fortifies this conclusion. Each defendant confessed to having participated in the murderous conspiracy. Each said he helped block the road. Each said he was present when Taylor was shot. Each admission of personal participation in the crime is corroborated by the eyewitness testimony of Harper and by other evidence as well. After establishment of the *corpus delicti* each confession is in itself sufficient to convict the confessor of murder in the first degree. Each confession in all these respects is competent evidence against the confessor. " 'In this setting, the fact that each defendant was also implicated by his codefendant's confession cannot realistically have contributed to either conviction.' " *People v. McFadden,* 84 Cal. Rptr. 675, 4 Cal. App. 3rd 672 (1970). Rather, the tainted portion of each confession was merely cumulative and contained no evidence which had not already been presented against each defendant through other evidence. The impact of the tainted portion on the mind of an average juror in face of the overwhelming evidence of guilt was "so unimportant and insignificant" that it may be deemed harmless. *Chapman v. California, supra.* This assignment of error is accordingly overruled.

For informative discussions of the *Chapman* and *Harrington* cases, see: Note, Harmless Constitutional Error: A Reappraisal, 83 Harv. L. Rev. 814 (1970) ; Note, Harmless Constitutional Error, 30 U. Pitt. L. Rev. 553 (1969) ; Philip J. Mause, Harmless Constitutional Error: The Implications of *Chapman v. California,* 53 Minn. L. Rev. 519 (1969). For treatment of *Bruton* as affected by *Harrington,* see: Note, The Admission of a Codefendant's Confession after *Bruton v. United States:* The Questions and a Proposal for their Resolution, 1970 Duke L. J. 329. As to *Bruton,* see also: 35 Mo. L. Rev. 125 (1970) ; 47 Tex. L. Rev. 143 (1968) ; 82 Harv. L. Rev. 231 (1968) ; Annotation, Federal Constitutional Right to Confront Witnesses— Supreme Court Cases, 23 L. Ed. 2d 853 (1970).

[5] The trial judge failed to caution the jury to scrutinize the testimony of Arthur Harper, an accomplice, and defendants assign same as error. No request was made for such an instruction, and the State contends the omission was therefore not error. The State is correct.

"The rule is that in the absence of a special request, the failure of the court to charge the jury to scrutinize the testimony of an accomplice will not be held for error, the matter being a subordinate and not a substantive feature of the case."

*State v. Andrews,* 246 N.C. 561, 99 S.E. 2d 745 (1957); *State v. Stevens,* 244 N.C. 40, 92 S.E. 2d 409 (1956); *State v. Hooker,* 243 N.C. 429, 90 S.E. 2d 690 (1956); *State v. Henderson,* 206 N.C. 830, 175 S.E. 201 (1934); *State v. Roux,* 266 N.C. 555, 146 S.E. 2d 654 (1966); Stansbury, North Carolina Evidence (2nd Ed. 1963) § 21. If a request is made for a specific instruction as to the rule of scrutiny with respect to the testimony of an accomplice, failure to so charge is error. *State v. Bailey,* 254 N.C. 380, 119 S.E. 2d 165 (1961). This assignment is overruled.

Defendants having failed to show prejudicial error, the verdict and judgment must be upheld.

No error.